DANIEL CORBIT, (acting assignee of David Wilson,) *vs.* THE PRESIDENT, DIRECTORS AND COMPANY OF THE BANK OF SMYRNA.

*Bank notes* though not money, have a certain legal character in some respects like money.

Though not a *legal* tender, they are a *good* tender, unless objected to.

The *effect* of a payment in *bank* notes does not arise from their conventional but legal character.

If passed in payment of *precedent* debts, there is no *implied* agreement to take them *as money*; as there is in case of a *sale* or *exchange:* or in a *cotemporaneous transaction.*

If at the time of a contract, a *bank* note be paid without endorsement, guarantee or agreement, it is received *as money,* and the *risk* of the solvency of the bank *is on the* part of the *receiver.*

In case of a guarantee of a note, the guarantor is entitled to reasonable notice of the insolvency of the payer.

A credit on the bank books for a general deposit is an acknowledgement of the receipt of so much *money*.

Action of assumpsit, for money had and received to plaintiff's use. Plea, non-assumpsit. Questions reserved by order of the Superior Court for New Castle county, at the May term 1837, to be heard on a case stated in the Court of Errors and Appeals.

The case was tried before Johns, jr. chancellor, and Black, Harrington and Layton justices of the Superior Court.

The facts agreed on, were these:

On Monday the 24th of March, A. D. 1834, and after bank hours on that day, a letter written by the plaintiff, and directed to a certain Presley Spruance, jr., a director of the said bank, residing in the town of Smyrna, where the said bank transacts business and is kept, was delivered by Spruance to Samuel H. Hodson, the cashier of the said bank; and at the same time Spruance delivered to the said cashier, a package containing notes of certain banks in Baltimore, the par value of said notes being on the face thereof, in the aggregate, the sum of $1,670. Of these there were bank notes of the bank of Maryland of various denominations, amounting to $1,510, in par or nominal value; and of the bank of J. J. Cohen, jr., & Brothers, amounting in nominal value to $160, which last mentioned notes are now and always have been at par and current as such.

The plaintiff's letter to Mr. Spruance was as follows:

*" Cantwell's Bridge,* 3d Month 24th, 1834.

P. Spruance, jr.,

Dear Sir:—By Chancellor Johns, I herewith enclose to your care sixteen hundred and seventy dollars, of Baltimore paper, which I wish you to deposit in my name as the acting assignee of David Wilson, in the Bank of Smyrna. This money may remain on deposit for a year, or, until a suit between George Houston and the assignees in Maryland is decided; and this fact may be some inducement for the bank to receive Baltimore paper, which under ordinary circumstances she might not do. You will please to inform me by *to-morrow's mail,* for, if the bank will not take it, I must go to Smyrna for it, in order to make some other arrangement elsewhere.

Your friend,

Daniel Corbit."

The hour of the day on which this letter and the bank notes were delivered to the cashier, was after three o'clock, P. M., and about the hour of four or five o'clock, P. M. The hours for the transaction of business in the said bank are between nine o'clock, A. M. and

three o'clock, P. M.; and by the by-laws and ordinances of said bank, no business can be transacted therein, except by special order of the directors, after the hour of three o'clock P. M., when, by the said by-laws and ordinances, the bank is closed.   But it is customary for the cashier of the bank to receive deposites after bank hours.

After Mr. Hodson had received the letter and counted the notes, he informed Mr. Spruance on the same day, "that he would take the money and pass it to Corbit's credit as desired; and further, that Spruance could write to Corbit that the bank had received the money."   And the said Spruance accordingly wrote to said Corbit by mail of next day, to that effect, and that no objection was made to the paper.

Upon the opening of the bank of Smyrna on the next morning, to wit, on the morning of the 25th of March, 1834, Hodson passed the whole amount of the said bank notes, to the credit of the said Daniel Corbit, on the books of the bank, after the usual manner of entering deposites on the said books, as follows, that is to say, " Cash deposited, $1,670, by Daniel Corbit, assignee of David Wilson."

At the time of the receipt of this letter and bank notes, by the cashier of the Bank of Smyrna, the Bank of Maryland had stopped payment that day, to wit, the 24th of March, 1834, being unable to redeem its notes.   On Sunday night, the 23d March, 1834, notice was left at the offices of the printers and publishers of the morning newspapers of Baltimore, dated the 24th, signed by " R. Wilson, cashier," of the said Bank of Maryland, of which the following is a copy, to wit;

" TO THE PUBLIC.

*Bank of Maryland*, 24th March, 1834.

The board of directors of this institution have ascertained, with surprise and deep regret equal to any that the community will feel, that this institution is unable to proceed with its business, and they have resolved to transfer all its effects to a trustee, for the equal benefit of the creditors of the bank.   The board of directors hope and trust that the assets will be sufficient to discharge the debts of the institution; and their determination to stop its business at once, is from a conviction that to continue it longer, would only be attended with a loss to the community.   Their advice to the creditors, founded upon the best judgment they are now able to form, is, not to sacrifice their claims.   The debtors of the institution will have the privilege of paying their debts with the notes and certificates of deposite and the open accounts due by the bank, and these alone they hope will enable the note holders and depositors speedily to realise nearly all if not the entire amount of their credits.

        By order,                          R. WILSON, *Cashier.*"

Until the morning of the 24th March, 1834, the notes of the bank of Maryland had been current in Baltimore, and the stock of said bank, the par value of which was $300 per share, had been steadily quoted in the public prints on the Saturday preceding, at $500 per share. No notice, intimation or suspicion of the failure of the said Bank of Maryland was received, or had, by the defendants, or their cashier, or by the plaintiff, until the 26th March, 1834, on which day the cashier received information from a traveller that the bank had failed. Until that day, (the 26th,) notes of all the Baltimore banks were received in deposit by the Bank of Smyrna without suspicion. No bank notes of the Bank of Maryland have been redeemed since the 22d March 1834, and the said bank has never since been opened for the transaction of business. Nothing has been received by the said Bank of Smyrna, for or on account of the said notes of the Bank of Maryland, nor could the said Bank of Smyrna at any time since the receipt of the said deposite of said notes, have received any thing from the said Bank of Maryland therefor. The affairs of the Bank of Maryland have not been brought to a final close. Nothing can now be had for the notes of the Bank of Maryland, or could at any time since the 23d March, 1834, have been had therefor, unless by selling the same at a discount in the market.

After the cashier had learned that the Bank of Maryland had failed, and at the first meeting of the board of directors of the Bank of Smyrna since the deposite of the said notes, to wit, on Thursday the 27th day of March, 1834, the said defendants being informed of the premises, proceeded to act upon the subject as directors of the said Bank of Smyrna.

The identical notes deposited by Corbit had been at all times kept to themselves, so separated from other paper as to be easily distinguished from all other notes or money, and had been kept altogether in one and the same bundle. The directors forthwith ordered them to continue to be so kept, and that the cashier give immediate notice to Mr. Corbit, that the bank did receive them as a special deposite, and that the identical notes deposited were to themselves, and would remain at all times subject to his order. In obedience to this order, the cashier immediately wrote (and Corbit received from him) a letter, of which the following is a copy:

*Bank of Smyrna,* March 27th, 1834.

D. Corbit, Esq.,

Dear Sir.—The board of directors have this day instructed me to say, that the money which passed to your credit, as acting assignee of David Wilson, on the 25th inst., by the hands of P. Spruance, jr., is received as a special deposite, and that the identical notes (being

principally of the Bank of Maryland) are to themselves, and will remain subject to your order or check.

Very respectfully, your obedient servant,

(Amount, $1670.)                    S. H. HODSON, *Cashier.*"

The last mentioned letter was put into the hands of Corbit by Hodson, on the afternoon of the same day (the 27th March 1834,) said Corbit being then in Smyrna, and having called on Hodson at that time. The plaintiff then informed the said cashier that he would go and see the man who had passed upon him this paper, and if he refused to take it back, he Corbit, would willingly commence a suit against him, if the bank should deem that course best: said bank notes were passed to said plaintiff by a certain George Biddle, agent of Ann Ford, executrix of George Ford, deceased, on Monday the 24th day of March 1834, between $12$ o'clock M. and 1 o'clock P. M. on that day, and were paid to him as the acting assignee of David Wilson in payment of a debt, due to said Wilson by George Ford.

The regular day of meeting of the directors of the Bank of Smyrna has always been and yet is, Thursday of every week. Of this the plaintiff knew at the time of said deposit, and it was matter of general notoriety. All the said bank notes so deposited by the plaintiff as aforesaid have always been kept by the said bank of Smyrna separate from other paper, since the order of said directors in regard thereto, and the bank has so kept them, subject to the order of the plaintiff. The bank now offers, and has been willing at all times, to deliver up to the plaintiff, the identical notes by him deposited as aforesaid: but the plaintiff submits it to the court, that by the cashier's act of receiving the said notes as cash as aforesaid, and in consequence of the entry to that effect on the books of the bank, the said bank had made the notes their own, and must bear the loss thereon.

It was agreed by the parties, that the court should give judgment for the plaintiff, for the amount of the notes of the bank of J. J. Cohen, jr. & Brothers, to wit: the sum of $160, there being no controversy respecting those notes. And it was further agreed, that if the court should be of opinion that the plaintiff ought to recover of the defendants the amount of the said notes of the bank of Maryland, at their par or nominal value, being the sum of $1,510, then judgment should be rendered for the plaintiff for the said sum of $1,510 in addition to the aforesaid sum of $160, and the defendants should retain the said notes of the Bank of Maryland. But if the court should be of opinion that the plaintiff ought not to recover as aforesaid, the amount of the said notes of the Bank of Maryland at their par or nominal va-

lue, then judgment should not be rendered for the plaintiff for any further sum that the aforesaid $160, the amount of the said notes of the bank of J. J. Cohen, jr. & Brothers, and in that event the defendants should deliver up to the plaintiff the identical notes aforesaid of the Bank of Maryland.

The cause was argued by *Booth* and *Rogers* for the plaintiff; and by *Frame* and *H. Stout* (of Balt.) for the defendants.

*Booth*, for plaintiff:

The question is, whether on a deposit in bank of the notes of another bank, which are received as cash, and carried to the general credit of the depositor *as cash,* the bank can afterwards treat it as a *special* deposite, and require the depositor to take the same notes back.

It is admitted that each of the parties is equally innocent in this business. Neither of them knew of the failure of the Bank of Maryland at the time of the deposite. The bank was to derive a benefit from the deposite, which was to remain for at least one year. Corbit gave them the choice, to receive it, or to refuse it at once, that he might have the opportunity to return the money to the person of whom he had it. They received it, and directed Mr. Spruance to inform him so. They received it *as cash*, and carried it to the credit of Corbit as cash. They, therefore, took upon themselves the risk of the solvency of the Bank of Maryland, and the loss must fall on them.

The general rule, as to paper transferable by bare delivery is, that the person delivering it does not guarantee that it is good, but only that it is genuine. The party receiving the bills, takes them at his own risk. This is the principle in all transfers by way of sale, or in payment of debts by mere delivery, without indorsement. 1 *Ld. Ray.* 442, *Governor & Co. of the Bank of England* vs. *Newman.*

Here the plaintiff sends notes to the bank and requires a speedy answer whether they will receive them; they answer that they will take them and credit him as so much cash. This is a purchase of the notes, and a payment for them: for the giving credit is the same as a payment to Corbit, and a deposite of that much cash by him. 10 *Wheat. Rep.* 333, 46, *Bank U. S.* vs. *Bank of Georgia.*

Viewing the matter in this light, if the Bank of Smyrna had paid the amount of these notes to Corbit, could they have recovered it back from him on learning that the Bank of Maryland had failed? Certainly not. And if he had then deposited that amount, could the bank have refused to pay the deposite? Certainly not. And yet the transaction is the same. 3 *T. Rep.* 757, *Fenn* vs. *Harrison ;* 1 *Esp. Rep.* 106, *Bolton* vs. *Reichard; Idem.* 447, *Fydell* vs. *Clark ;* 15 *East.,* 7, *Emly* vs. *Lye ;* 13 *Com. Law Rep.* 201, *Cammidge* vs. *Allenby.*

If Corbit had owed a note to the Bank of Smyrna, and had paid

these notes to the bank, there might be some reason in contending that he should be responsible for the solvency of the notes : though I doubt whether in the case of banks the court would hold the payer liable.   There is a manifest distinction between that case and the case of a depositor in a bank.   Banks could not do business on such principles.   Their depositors, if the notes which they deposited were liable at all times to be returned upon them, would soon draw out all their deposites, and would not suffer them to remain on any such terms.   It is for the interest of the banks, then, to take these notes as cash.

Again, on the principles of all negotiable paper where there is a liability over, it is incumbent on the party to give *notice* of the failure of the party first bound to pay.   General knowledge by Corbit of the insolvency of the Bank of Maryland will not do; he was entitled to notice from the Bank of Smyrna of the failure of the Bank of Maryland.   It is true they notified him that the notes were received as a special deposite; but this was not notice of the failure of the Bank of Maryland; and it was an act which the board of directors had no authority to do, as their officer had already received the notes as cash, and carried them to the general credit of Corbit.

This principle, then, decided by *Lord Holt,* and followed up by all these decisions, is the principle which must govern this case, that a party passing, depositing, or having discounted a note payable to bearer, without indorsing it, is not answerable for the solvency of the note.   The exception is the case of passing a note in payment of an antecedent debt, and the reason is because there is an antecedent obligation to pay *money;* and if the notes paid do not turn out to be good money, the payer is liable over; but in all the other cases there is no obligation to pay or receive, and it stands on the agreement of the parties.   If they agree to take them as cash, they are cash; and in all cases this agreement will be implied unless the party indorses the note, and thus makes himself liable.   7 *Term Rep.* 65, *Owenson* vs. *Morse,* illustrates this rule.

Bank notes are stronger than the ordinary cases of evidences of debt or negotiable paper.   They are treated as money.   1 *Burr. Rep.* 452, 7.   And this is peculiarly so in the United States.   *Angel & Ames on Corp.* 132.   In case of a general deposite the bank is authorized to use the deposite subject to the draft of the depositor; in the case of a special deposite it is not so.   2 *Pet. Rep.* 318, *Bank of Kentucky* vs. *Wistar;* 1 *Binn. Rep.* 27, *Levy* vs. *Bank U. S.;* 6 *Mass. Rep.* 321, *Ellis* vs. *Wild;* 11 *Johns. Rep.* 409, *Whitbeck* vs. *Vanness; Byles on Bills,* 91 ; 16 *Law Lib.* 54.

1st. Then, between these two innocent parties the bank is, on the principles of law, to bear the loss; and, 2dly, it is equally so on principles of justice, having, by accepting these notes on general deposite, prevented Corbit from returning them immediately to the person of whom he had received them.　Having received them from Ford in payment of a pre-existing debt, Ford would have been bound to take them back.　Corbit would now be without remedy, having been prevented by the bank from returning the money to Ford in due time.　The mere fact of Corbit having passed them to the bank and received credit for them, which was equal to payment for them in cash, would prevent his recovery against Ford.　3 *Cranch*, 218.

*Stout,* for defendant :

The 10th *Art.* of the constitution U. S., prohibits congress, or any state, from making any thing a legal tender but *gold* and *silver.*　Bank paper is a conventional representative of cash; but the moment it loses that conventional character it is waste paper. ᾽ Cash is gold and silver, and nothing is money but cash.

The plaintiff's narr., is for *money* had and received to his use.　Is it sustained by the fact ?　Did the Bank of Smyrna receive *money ?*

A receipt for so many " *dollars*" has been decided to be no payment of a debt, because the payment was in the notes of a third person.　2 *Gill & Johns.* 512.　The receiving bank notes as money is nothing more than *conventional regulation,* and this cannot be carried any further than while the bank pays its notes in gold and silver. 13 *Wend. Rep.* 104-5.　Is the word cash more effectual than money ? Goldsmith's notes were once considered as *money,* and once so decided by *Lord Holt,* but this doctrine has been exploded.　2 *Johns. Rep.* 461.　A receipt for "dollars" is no payment of money unless cash be paid.　5 *Ibid,* 68.

This is an action of assumpsit.　1 *Selw. N. P.* 31, definition of the action of assumpsit.　A contract is an agreement to do or not to do something on a sufficient *consideration.*　4 *Wheat.* 122.　The plaintiff is to recover a compensation for an injury sustained.　1 *Esp. Rep.* 5, 6.　If a bill or note be of no value, it may be considered as waste paper.　2 *Johns. Rep.* 61 ; 6 *T. Rep.* 52-3.　If the bill turn out to be bad, it may be considered as a nullity.　And there is no difference between individual paper and bank paper.　11 *Wendall,* 1 6, judge *Savage* alludes to these cases and others, and says, " these cases assume that notes thus delivered are of value when delivered."

Now, the plaintiff is to recover a compensation for an injury sustained.　What injury has he sustained ?　A nullity can beget nothing, and these notes when deposited were waste paper.　It is utterly im-

possible that in divesting himself of waste paper he could acquire a right to recover compensation for an injury.

Then a contract must be on a *sufficient* consideration. *Ex nudo pacto non oritur actio.* What consideration could arise on the deposit of worthless paper for the contract to pay cash?

It is difficult to distinguish between cases of forged paper and insolvent paper. 5 *Taunt.* 488; 13 *Wendall,* 105.

Suppose Corbit had sold the bank a dead horse, a burnt house, a sunk ship, or a farm swept away by a flood; would it form a consideration for a promise to pay? 4 *Price Exchec. Rep.* 105; 2 *Kent Com.* 468. It is the very essence of the contract that the thing sold should have not only a potential but an actual existence. The Bank of Maryland, if not overwhelmed by a flood of water, was sunk, and submerged by a flood of ·insolvency. Its paper was worthless—a non-entity.

*Story on Bailments,* sec. 97, 240, in speaking of deposites, says there is an irregular or improper kind; when the depositor delivers the thing to be returned. Deposites of money to banking corporations is a loan to be returned. *Sec.* 372, locatio, or hire for use: *Sec.* 222, a mutuum or loan for consumption; corn, wine and money classed together. What is the doctrine as to these? A warranty. 1 *Selwyn, N. P.* 334, *n.* 5; 482, *n.* 1; 2 *Kent Com.* 479; *note c, last ed.,* as to provisions. 1 *Blac. Com.* 439; 2 *Camp.* 390, as to wine. I refer to these cases because judge *Story* has connected money with corn and wine, and *noscitur a sociis.* 2 *Johns. Rep.* 459. If a creditor receive brass instead of gold, the debt is not discharged.

But it was said that the bank ought to have offered to return the notes. And did'nt they? See the case stated. How did the bank injure Corbit? It gave him immediate notice that the notes remained by themselves and subject to his order. Should he not then have taken them and resorted to Ford of whom he took them. 6 *Barn. & Cress.* 373, (*Com. Law Rep.,* 102,) was a case of laches: the payer kept the notes a week, and then did not offer to return them.

*Chitty on Bills, last ed.,* 387. The necessity of presenting the bills obviated by an offer to return them. And this refers to and explains *Cammidge* vs. *Allenby,* cited for plaintiff. ·Where the bank stops before the notes could be presented, and the notes are offered to be returned, there is no necessity of a presentment or notice of non-payment. Here the bank had failed before the notes were deposited.

Mr. Booth admitted that insolvent paper is not a payment of a precedent debt; but he insisted that it was a payment in a simultaneous transaction of bargain and sale. What is the reason of the

distinction? If a note will not pay for a hat bought yesterday, why should it pay for the same article bought now. The distinction does not exist. 11 *Wendall,* 1, 9, and 13 *Wendall,* 101, *Lightbody* vs. *Ontario Bank.* Judge *Savage* had to decide this question, on which *Kent* and *Spenser* differed. He followed Kent, and had the good fortune to have his opinion confirmed by nineteen out of twenty of the Court of Appeals. This case reviewed all the cases cited.

*Chitty on Bills,* 268. A distinction was once taken between payment of a precedent debt and a concurrent payment; but it is now settled that unless it be expressly agreed that the assignee should take the paper as payment and run the risk, it is no payment. 1 *Cowen R.* 383; 1 *Esp. Ca.* 3, *Stedman* vs. *Gooch ;* 6 *Term Rep.* 52; 6 *Ib.* 60; 2 *Johns Rep.* 461, though a case of forgery, assents to 7 *T. Rep.* 62, *Owenson* vs. *Morse ;* 11 *Wendall,* 16.

Is there any difference between bank notes and individual notes? They are equally promissory notes. 6 *Barn. & Cress.* 13, (*C. L. R.;*) 11 *Wend.* 15 ; 9 *Johns. Rep.* 310, 11 ; 2 *Ib.* 461. There must be a clear and *special* agreement to take the paper as money, and to *run the risk of collection.* 1 *Cowen R.* 383.

The same rule that applies in cases of forged paper applies to the case of worthless paper. 2 *Stark Ev.* 596, *n.* 1. All the cases show that a payment in forged paper or base coin is no payment. 2 *Johns. Rep.* 455, 460, 461.

When a bank fails its notes are of no value, and the loss shall fall on the person in whose hands they are at the time. 11 *Wend.* 14. As the death of the bank leaves its notes so judgment finds them— worthless, a nullity. Finding them thus, what compensation can Mr. Corbit claim for this worthless paper? What consideration has the bank received for an obligation to pay him any thing? What injury or loss has he sustained from their not paying him something for nothing?

*Frame,* on the same side.—General indebitatus assumpsit, on the implied promise which the law raises in consequence of the transaction. An action, therefore, on the lowest order of responsibility, requiring a clear case of legal liability.

What are the facts? A deposite by plaintiff of the notes of a broken bank, in the general course of business, on *Tuesday* morning, both parties being ignorant of the failure of the bank. The notes kept separately, never mingled with the other notes in the bank's vaults. The knowledge of the failure of the Bank of Maryland received on *Wednesday.* On *Thursday* Corbit notified that the paper was kept separate and held subject to his order, thus refusing to take

them as cash. The bank has never received any thing on these notes.

The whole transaction, then, from which any thing of assumpsit can be implied, is the mere act of the deposite of these notes. The character of this deposite is a bailment. I am willing to admit that a bailment of this kind makes the notes the property of the bailee, and makes him responsible to the bailor for the value of the deposite. And can the principles of justice require that, in a case where the bailee is able to return the identical deposite, he should do any thing more? There being then, no thing of value deposited with the bank, what is the consideration on which to found this implied assumpsit to return any thing of value. Even in the case of an express promise, there must be a consideration, for *ex nudo pacto oritur non actio*; equally and more so is it necessary that there should be a consideration to support a legal liability growing out of the implied assumpsit.

The action of assumpsit is peculiarly an equitable action. Even in the case of a receipt of money, gold and silver, a party cannot be compelled to repay it, unless on the principles of equity it would be unjust for him to retain it. *Chitty on Bills*, 12, 13, 91; 5 *Johns. Rep.*; 8 *Ibid.*; 3 *Term Rep.*; *Douglass*, 138; *Cowper R.* 199, 200; 2 *Burr. Rep.* 1010, 1012; 4 *ib.* 2134.

These are fundamental principles of the action of assumpsit for money had and received—the claims of natural justice. What, then, is the natural justice of this case? Keeping in view the admission of the case stated, that nothing was delivered but waste paper, would not natural justice be violated by compelling the bank, instead of returning this useless paper, to restore in place of it *gold* and *silver* to the amount of its nominal value. It is admitted that both are innocent; and in that case *melior est conditio defendentis, or possidentis.* 1 *Mass. Rep.* 66. And this applies where both are equally innocent or equally guilty. 3 *Burr.* 1526. 17 *Mass. Rep.* 42.

It is argued, that because the bank received these notes on general deposite, and placed them to the credit of the plaintiff as cash, they are bound to pay him the amount of their nominal value in cash; and this in the face of an admission that notes and not cash were deposited. And it has been said that in this country, bank notes are money. On the contrary, I say peculiarly in this country, nothing is money but gold and silver coin; and nothing else can be made money by law, without a violation of the constitution of the United States.

Even Lord Mansfield's remarks in 1 *Burr.* 457, have been carried beyond their legitimate effect. His meaning is, that by common con-

sent, bank notes are *treated as money*, not that they are money.  So far from it, he places it on the general consent of the community.

We agree to this principle, that bank notes constitute a part of the currency, and by conventional arrangement, are treated as money : but what is the foundation of this agreement of the community? that they represent money ; that they are convertible into money, because the bank which issued them is bound to pay in specie.  The solvency of the bank, therefore, is the basis of this conventional character, which is given to notes as money.  It is so regarded by Lord Mansfield, in the case cited.  If this be the foundation of the agreement to treat these notes as money, can it remain when the foundation fails? The moment that the bank ceases to redeem the notes and pay them in cash they cease to be regarded as money, and their character as money fails.  A party may to be sure, receive the paper after such failure, being ignorant of the fact ; but that does not alter the character of the notes as useless paper, and restore them to the character of money : and on the principle of a mistake of the fact, he would not be bound to keep them as money.  I do not deny, that if, with knowledge of the fact, they choose to take them *as money*, they would be bound to abide by their agreement.  These principles are fully recognized by the case in 11th and 13th *Wendall's Rep.*, which settles this case.  It is true as was said by Mr. Booth, that the principle decided was, that payment of notes of a broken bank did not discharge a pre-existing debt ; but it is clear, both from the reasoning in this case and the other cases, that there is no distinction between paying a pre-existing debt, and generating a debt.  If it will not discharge a debt, how can it create a debt?  It is in vain to say that these notes were taken as cash : they were so taken in profound ignorance of the failure of the Bank of Maryland.  The policy of the law in relation to the notes of insolvent banks, is to drive them out of circulation the moment the bank fails.  To let them lose their conventional character as money, when they cease to represent money : and, if they be afterwards passed in ignorance of the fact, to give to the party receiving them the right to return them, on the ground of mistake.  A contrary doctrine leads to endless frauds in the shifting of liabilities.

It was considered by the other side that this was the case of an actual payment by the bank to Corbit of money to the amount of these notes ; and an immediate deposit of cash by him.  I deny it— but suppose it was so, would it better his case?  It would be the case of money paid by mistake ; money paid without a consideration ; and the principle is undoubted, that in case of such payment the party may recover it back.  And the bank still having possession of the

notes; or, if they please, of the money, which was ignorantly paid for the notes; they may equally and *a fortiori* defend themselves on the same principle—a fortiori, because melior est conditio defendentis. But there was no payment. It is not like the case in 10 *Wheaton* 333, where the notes deposited were the notes of the bank receiving them; and so of the case of the Bank of Kentucky, 1 *Peters Rep.* 325. Here the notes deposited were not the notes of the Bank of Smyrna, which would be a payment and create a liability to pay cash; but of notes of the Bank of Maryland, which were worthless; which were only received on account of a supposed conventional character of solvency which they no longer possessed.

It has been conceded that where the paper passed is forged paper or base coin, the payer is responsible. 10 *Wheat.* 342, 2 *Johns. Rep.* 455. Now where can be the difference between a forged note, and especially of base coin, and the note of a broken bank. As it regards value, any thing that could constitute the consideration for a promise; they are the same. A forged note cannot be worth less than nothing, and the note of a broken bank is worth nothing. They stand then on the same footing. There is no reason for a distinction. Neither is there any reason for the distinction contended for between the payment of a pre-existing debt, and a co-temporaneous transaction—unless on the ground of express agreement to receive the notes as cash. The existence of such an agreement is assumed in every case where such a payment has been considered good. *Chitty on Bills*, 185; 7 *T. Rep.* 60; 1 *Strange*, 415-16; 5 *Johns. Rep.* 68. 1 *Cowen*, 382, reviews the cases and places it on the footing of agreement.

The case cited from *Lord Raymond* as the foundation of this distinction, is the case of discounting a bill; buying it at the vendee's risk, without guarantee of the vendor, and the plain principle of caveat emptor governs the case. 1 *Esp. Rep.* 106; same case as that in 6 *Term Rep.* 130, *Bolten* vs. *Riechard* or *Richard*, on the footing of agreement. 15 *East.* 13, on the same ground. The course of business in these cases of buying individual bills, is to take the indorsement of the vendor, if it is designed to resort to him, and the failure to do so is evidence of the agreement—not so of bank notes. 6 *Barn. & Cres.* 373; (13 *Com. Law.* 202,) turned on *laches*. Where is the laches here. The counsel started some idea that the Bank of Smyrna was bound to notify Corbit, and tender a return of the notes. The case stated, agrees that they did so, and without delay. The money was received on Monday after banking hours. He deposited on Tuesday. The bank heard of the failure on Wednesday, and notified Corbit on Thursday. 11 *Johns.* 453, was a special agreement to give $90 for a horse, provided the vendor would take the note of a

third person in payment.  6 *Mass. Rep.* 321, *Ellis* vs. *Wild*, was on the same principle of agreement, but is not law; because the notes taken were forged.  5 *Taunton* 488, is *contra.*  3 *Cranch*, 218, does not conflict with this view.  All the other cases cited are the cases of a sale of the bill or note—shaving transactions; the very essence of which is risk, and profit for the risk, and the rule is caveat emptor.  1 *Lord Raymond*, 442; 3 *T. Rep.* 757; *Ves. jr.* 368; 15 *East* 6; 2 *Barn & Ald.* 327; 2 *Coxe Ch. Ca.* 171.  Again, Daniel Corbit in this case is not without remedy, though the bank is.  The case stated sets out that he took the money from Ford in payment of a pre-existing debt, and all the cases agree that such a payment does not discharge such a debt.  He and the bank then do not stand in equal equities; and I have shown that the principle of law is, that if he had not a greater equity to claim this money of the bank than they to hold it, the bank being the defendant, shall be permitted to hold on.  The equity of the bank is not only equal but stronger than his.

*Rogers* in reply :—

There are three aspects under which this cause must be viewed. The two first are, in my opinion, incontrovertibly in favor of the plaintiff, and only the last is debateable.

1st.  I agree with the other side, that it was not necessary for the Bank of Smyrna to present these notes to the Bank of Maryland. This was formerly the doctrine of the courts, but two cases of later authority, decided in England, have established that the insolvency of the bank excused the presentation.  But though presentation is not necessary, it was necessary that the bank should, in this case, have given notice to Corbit of the insolvency of the Bank of Maryland, and offered to return the notes within a reasonable time.  *Bank of Wil. and Brand.* vs. *Cooper*, and *Sappington* vs. *Caldwell*, 1 *Harr. Rep.* 10, 14.  The question of laches then does come up, and the court is to say whether these parties are in fact equally innocent, not in reference only to the knowledge of the failure of the Bank of Maryland, but as to subsequent conduct.  13 *Com. Law Rep.* 202-3, *Cammidge* vs. *Allenby*, was the first case that excused a presentation ; but it requires notice to the other side, and an offer to return the notes.  *Chitty on Bills* 386-7 ; *Byles on Bills*, 54, recognize the same principle.

The principle then is, in order to excuse from the charge of laches, it must appear that the bank, in a reasonable time, gave notice to Mr. Corbit that the Bank of Maryland had failed, demanded repayment of him, and offered to return to him the notes, in order that he might resort immediately to the makers, or to the person who passed them to him.  In this case the bank never gave notice to Corbit—

never demanded payment of him, and did not within a reasonable time offer to return the notes. What is reasonable time is to be collected from the facts, facts which it was incumbent on the defendants to lay before the court. Reasonable notice is the earliest notice that can be given. If living in the same town, on the same day; if out of it, by the next mail. The offer to return was not made until Thursday, although the Bank of Maryland failed on Saturday evening or on Monday morning; and knowledge of this fact was received by the defendants on Wednesday.

But did they ever give him notice of the failure of the Bank of Maryland? It is not sufficient that he may be supposed to have heard it; the bank was bound to give him notice of the insolvency, as this was the only principle on which they could call on him for repayment. The action of the board was to order the cashier to notify Corbit that the notes were held as a special deposite and not as a general one. They were not authorized thus to change the nature of his deposite, which had been received as a general one, as cash, into a special deposite. He was not bound to treat such a notice with any attention; non constat that Corbit had then heard or knew of the insolvency of the Bank of Maryland, and they have never to this day notified him of the failure. And of the deposite there were $160 of notes of Cohen & Brothers, a specie paying bank, which the failure of the Bank of Maryland could not affect. The notice equally applied to these, and being clearly illegal as to them, it was void altogether. If they had notified him of the failure of the Bank of Maryland, and demanded repayment for those notes, offering to return them, Corbit's resort would have been easy as against Ford. Having failed to do so, their laches has prejudiced him.

2d. But the only true aspect in which this case can be considered, is that of a sale of these bills by Corbit to the bank. This is the business of banks. The court must assign to the transaction some character. What was it? The bank sold nothing to Corbit; there was no matter of exchange; it was simply the sale by Corbit to the bank of these notes for so much cash, or so much credit, which was equal to cash to him, and more beneficial to them, because by the agreement it was to remain as credit for one year. The bank derives benefit from such a purchase; it throws out its own notes in place of others, which either give, or are supposed to give them cash or credit more valuable to them than their own notes. The notes purchased are either at par or below par: the purchase is made accordingly, and in either case the purchaser not taking the indorsement or guarantee of the vendor, cannot resort to him. The doctrine of caveat emptor applies. It is precisely like the case in

*Lord Raymond.* It is immaterial that in that case the Bank of England took a discount; it is equally beneficial to the bank to purchase at par, bills that are at par in the market. It is beneficial to the banks to get these city notes in exchange for their own, because they thereby keep up a circulation of their own paper. In every such case the transaction is simply a purchase by the bank of city paper, and payment made in its own paper. 3 *Vesey, jr.*, 368; 3 *T. Rep.* 757; 15 *East*, 6, 12; 1 *Esp. R.* 447; *Byles on Bills*, 91; *Chitty on Bills*, 271. Wherever there is a sale of the bill itself without indorsement, there is no resort. No question has ever arisen in such cases, but only in cases of a sale of goods and payment in bills, as in *Cammidge* vs. *Allenby*, and where a distinction has been taken between a previous debt and a cotemporaneous transaction, which cannot arise in the case of a sale of bills.

This being the character of the transaction, a purchase by the bank of these notes of Corbit, the next position I take is, that there was an actual payment for them. *Levy* vs. *The Bank of the United States*, 1 *Bin. R.* 27; 5 *Barn. & Cress.*; 10 *Wheaton*, 340, 345, *Bank United States* vs. *Bank of Georgia*, a simple deposite to the credit of the United States Bank as cash, held a payment.

3d. Is the only debateable point in the case according to my view. I refer to the doctrine founded on the distinction between payment of an antecedent debt and a simultaneous transaction. I contend that the distinction does exist. If bank notes be paid to a precedent debt, which are not good, and the party taking them use due diligence, it is no discharge of the debt. But in case of a simultaneous transaction, where the notes are given for the thing bought, the taker receives them at his own risk, and has no resort to the other party. The case cited by the other side from 11 and 13 *Wend. Rep.*, is the case of payment of an antecedent debt, and any opinions therein expressed which appear to go beyond such a case, are extra-judicial, and can be shown to be wrong. They assume, that on the failure of the bank its notes lose the character of money, and become merely promissory notes. Then do not all the principles of notice and diligence, which apply to promissory notes, apply to them as such? The chancellor admits, that in receiving notes of a bank, the taker runs the risk of its failing. I say he also runs the risk of it having failed. His position is sound, but it don't go far enough. He should have laid down the position, that wherever a man takes a bank note, without indorsement or guarantee, in the course of an original transaction of sale or exchange, he takes it at the risk of the insolvency present or future of the bank. *Cammidge* vs. *Allenby*, 6 B. & C. 373, 13 C. L. 282, 3, 4, shows that the English rule goes to the ex-

tent I have stated. That was the case of a pre-existent debt, but the court say that if the notes had been paid at the time the corn was purchased, it would have been a payment, though the notes were then insolvent.

Upon their principle, the notes of a distant bank may be in circulation months after the failure, and pass through hundreds of hands; and then you must look back through all these different holders, with all the difficult questions of notice and diligence, and the difficulties of proof, and find the man in whose hands the notes were at the moment of failure. We must look at the state of things existing in our country; banks innumerable scattered all over it; their circulation at great distances from their location; and say if the principle announced in *Cammidge* vs. *Allenby* is not the most reasonable one. I am aware that *Chitty on Bills,* speaks of the explosion of this distinction, but he founds himself on the case of *Owenson* vs. *Morse,* 7 *Term Rep.* 65, which was decided on the principle of stoppage in transitu. *Byles on Bills,* 91, a later author of high celebrity, lays down the principle differently from *Chitty;* and cites all the cases. The doctrine has also been most ably examined in another New York case, (11 *Johns.* 409,) where chief justice *Spencer* recognizes the distinction. And also in 2 *Johns.* 455, 409, *Markel* vs. *Hatfield,* commented on in 11 *Johns.,* the court said that if the note, instead of being a forged note, had been genuine, it would have been otherwise.

1 submit, then, that on an examination of all the cases, the court will conclude that, with respect to an original transaction, the payment of a note of a broken bank is conclusive, the receiver taking upon himself the *present* as well as the *future* solvency of the bank.

Mr. *Justice* BLACK delivered the opinion of a majority of the court.

BLACK, *Justice.*—The prominent facts set forth in the case stated are briefly these :

On Monday, 24th March, 1834, about noon, D. Corbit, as an assignee of David Wilson, received from George Biddle, agent of Ann Ford, $1,510 of the notes of the Bank of Maryland, and $160 of the Bank of Cohens, in Baltimore. On the same day he enclosed them to Presley Spruance, to be deposited in the Bank of Smyrna to his credit, stating, that if the bank would so take them, they should remain on deposit for one year, or until a certain suit by George Houston should be ended. On the same day, but after banking hours, Mr. Spruance handed the letter and notes to the cashier of the bank, who told Spruance he would take the money and pass it to Mr. Corbit's credit as desired, and that Spruance could write to Mr. Corbit that the bank had received the money, which Spruance did by the mail of the next day, and informed him that no objection

had been made to the paper. On the next morning, (the 25th,) the cashier passed the whole amount of the notes, $1670, to the credit of Mr. Corbit, on the books of the bank, in the usual way of deposits as cash. On the morning of Monday, the 24th, the Bank of Maryland stopped payment, and has ever since remained closed, and is unable to pay its debts. Until that morning its notes had been current in Baltimore. At the time of this deposit both plaintiff and defendant were alike ignorant of the failure of the bank, or of any suspicion of such failure. On Wednesday the 26th, the cashier of the bank received information from a traveller that the Bank of Maryland had failed. On Thursday the 27th, the directors met and resolved to keep the notes in question by themselves, and directed him to inform Mr. Corbit that the money which had been thus deposited to his credit *was received as a special deposit,* and that the identical notes were to themselves, and would remain subject to his order. On the afternoon of the latter day, the 27th, this notice was given Mr. Corbit.

Such are the material facts of this case, and we are called upon to say upon which of these parties, under the circumstances disclosed, does the law place the loss which has arisen from the failure of the Bank of Maryland.

Bank notes constitute a large and convenient part of the currency of our country, and, by common consent, serve to a great extent all the purposes of coin. In themselves they are not money, for they are not a *legal tender ;* and yet they are a *good tender*, unless specially objected to as being notes merely and not money. *Miller* vs. *Race*, 1 *Burr.* 457 ; *Bank of United States* vs. *Bank of Georgia*, 10 *Wheat.* 333 ; *Handy* vs. *Dobbin*, 12 *Johns.* 220 ; *Wright* vs. *Reed*, 3 *Term*, 554.

They subserve the purposes of money in the ordinary business of life, by the *mutual consent* (express or implied) of the parties to a contract, and not by the binding force of any common usage; for the party to whom they may be tendered has an undoubted right to refuse accepting them as money.

It would seem, therefore, that they do not in themselves possess, under any circumstances, the abstract legal character of money; nor are they of themselves the complete representatives of the legal currency of the country. Bank notes, however, as well as the negotiable notes of individuals, which pass by delivery and not by indorsement, have by judicial determinations, acquired to a certain extent and under certain circumstances, a character as money, which may with propriety be termed a legal character. This arises not from the intrinsic character or worth of the notes, but from the

circumstances under which, and the objects for which, they are transferred and accepted. They may be transferred either with or without an agreement or understanding. The agreement may make them money or not money; but if there be no agreement or understanding express or implied, the rules of law and not any general usage or any assumed conventional regulation, determine when and in what cases they are money and when they are not. This, according to our apprehension, depends on the effect or operation which, according to legal principles, has been produced by the transfer of the notes. If they have worked payment or satisfaction, actual or legal, they are in such case considered as money, and equivalent to so much coin. But if such effect be not produced, then in that case they are not held as money.

In deciding the present case, it is not essential that we should determine whether the character which bank notes have obtained as money be one that is intrinsic or conventional; but the question may properly be disposed of by applying to it those principles of law which have been settled in relation to the transfer of negotiable notes payable to bearer, whether issued by banks, other corporations, or individuals. It may be proper, however, briefly to advert to the position that has been urged upon us, that the character of bank notes as money is purely a conventional regulation.

Chancellor *Walworth,* in the case of the *Ontario Bank* vs. *Lightbody,* 13 *Wend.* 104, states that the receiving bank notes as money is not a legal but conventional regulation, and obtains only so long as the bank redeems its notes in specie; that while thus redeemed, they are considered as money and are taken at the risk of the receiver; but that the moment it ceases to redeem its notes, they cease to be the conventional representative of the legal currency of the country, whether the holder be aware of the fact or not; and if they are afterwards passed off by him, he must sustain the loss which has already occurred. However highly we respect the decisions of that able judge, we must hesitate yielding assent to the position he has assumed, if it is to be one of universal application; if it is to be applied to contracts and debts of all classes—to cotemporaneous as well as pre-existing debts. He has adduced no authorities in its support, and it seems to us to be at variance with prior decisions both in this country and in England.

The character which bank notes, or any other negotiable notes, have as money; the *legal effect* of a payment in them, and the agreement *implied* on receiving them; seem not to arise from or to be established by any conventional regulation. The community may,

for the facilities of business, by what may be assumed to be common consent, or a conventional regulation, receive bank notes; they may receive them with an express agreement or without any agreement, or may refuse them altogether, for they are not a legal tender: and so may each member of the community. But if they be received without any agreement or understanding as to liability, the law regulates their operation, and settles how far they are to be considered as money.

Judicial decisions, therefore, and not conventional regulations, we apprehend, have settled and must continue to settle the point, how far and when bank notes or other negotiable notes, when passed away, are to be deemed money and operate as money. If they are passed in payment of a precedent debt, courts of justice have settled their character in such case, and their legal operation. If they are parted with in exchange or sale, the rules of law as to each of these being the same, (2 *Black's. Com.* 446,) their character and effect have in like manner been fixed by the determinations of courts. These rules do not depend on, nor are they affected by the solvency or insolvency of the makers of the notes, nor are they based on any conventional regulation. When such notes are transferred from hand to hand, they pass, not according to what may be assumed to be a conventional regulation, but according to the legal rules or principles which courts have applied to such transfers. If the community or any individual wishes to get rid of the principles that courts have thus fixed, or to avoid their application, it is not to be effected by what may be considered a conventional regulation, but by adopting such a course of conduct where bank notes are tendered (either refusing them, having an agreement, or taking a guarantee) as will prevent the application to the transaction of the established rule. Test the principle that by the conventional regulation, bank notes cease to represent the legal currency of the country from the moment payment of them in specie is refused, and all loss thereafter falls on him who passes them, by the course of our banking institutions and the business transactions of our country during the last twelve months: none of the banks paid their notes in specie; no debts or contracts between individuals were discharged in specie, and yet the only currency was bank notes. Is this conventional regulation to be applied to all transactions during the period of suspension? Were no contracts legally fulfilled nor debts discharged? Are those who passed bank notes responsible for the difference in value between them and specie? This will not be pretended. Although the suspension of specie payments was universal on the part of the banks, it was not during

that period the conventional regulation that their notes did not pass as money, for they were almost universally received as such by banks and individuals.

It does not, therefore, follow, that because a bank has suspended specie payments that her notes no longer pass or operate as money; nor that the person who may afterwards pass them bona fide is necessarily a guarantor of their solvency. That depends upon the purpose to which they are to be applied, whether to pay a pre-existing debt, or to fulfil a contract made at the time.

In the case of *Cammidge* vs. *Allenby*, 13 *Com. Law*, 201, *Littledale*, justice, says, " I think there is no guarantee implied by law in the party passing a note payable on demand to bearer, that the maker of the note is solvent at the time when it is so passed." *Bayley, J.,* in the same case, says, that if the notes (those of a banker who had failed on the day of the sale) had been delivered at the time the corn was sold, instead of some hours after, the person receiving the notes would have been without remedy, as the notes would have operated as payment.

In *Young* vs. *Adams*, 6 *Mass. Rep.* 182, Judge *Sewall*, in delivering the opinion of the court, says, " The responsibility of the bank, when the bills are true and genuine, is, we believe, at the risk of the receiver, except when paid after a known failure, if the fact be known to the payer, and the payee may be supposed to be ignorant of the fact."

In *Whitbeck* vs. *Van Ness*, 11 *Johns.* 409, justice *Spencer*, in commenting on the case of *Markle* vs. *Hatfield*, 2 *Johns.* 455, which was decided while he was a member of the Supreme Court, declares his opinion, that if a bank note has been passed away for a cotemporaneous debt, there is no liability on the person passing it, although the bank had at the time failed, if both parties were equally ignorant of the fact.

From the language of chief justice *Kent*, in the case of *Markle* vs. *Hatfield*, such would seem at that time to have been the inclination of his mind, for he says, " The negotiable note of a third person and a bank note are equally promissory notes for the payment of money; and if the receiver may be presumed in *the one case* and *not in the other* to have taken upon himself the risk of the solvency of the drawer, there is no presumption in either case that he takes upon himself the risk of forgery."

If the rule laid down by chancellor Walworth, was intended by him only to be applied to cases of " antecedent debts," which was the case before him, and decided by him on that ground, there is perhaps

no discrepancy between his opinion and those which we have cited ; but if it was designed by him to go further, it is at variance with the cases referred to, and is not sustained by authority. It has, however, been urged with great ingenuity by the counsel for the defendants, that as to bank notes and the negotiable notes of third persons, payable on demand, the rule of law is the same, whether they be given in payment of a "precedent debt," or for goods bought at the time the note is given in payment, and which have been denominated cotemporaneous debts. To this position, after a close examination of the authorities cited, we cannot yield assent. A distinction has existed in England for more than a century. In the latter case, the notes operate as payment and are, therefore, held to be the same as money, and the risk of the solvency of the maker of the note is upon the person *receiving*, for no debt strictly is created ; no credit is given to the person, but it is given to the note accepted ; it is a sale or exchange. In the former case they are not payment, and therefore, not held as money, and the risk is upon the person *paying*, for there a personal credit had been given, a debt created ; unless in either case, an agreement to the contrary, express or implied be established. If at the time of contract, a negotiable bill or note payable on demand, either of an individual or corporation, be transferred and received without indorsement, or any agreement or understanding as to risk, whether in exchange for goods sold and delivered, or for other bills or notes, money or credit ; it is a sale of such bill or note by the party delivering it, and a purchase of it with all risks by the party receiving it. It is considered in the same point of view as exchanging money for money, and the law implies, in the absence of proof to the contrary, that it was part of the original contract, that such note or bill was taken in absolute payment : for if such had not been the understanding, the receiver would either have refused the note or taken some guarantee of its goodness.

This rule was first laid down by chief justice *Holt*, in 1699, in the case of the *Bank of England* vs. *Newman*. It prevailed in England through the last century, and is recognized as recently as the year 1837, in the case of *Cammidge* vs. *Allenby*, to which we have before referred. If the notes be given at the time the contract is made and executed, the person taking them has no remedy against the person from whom he receives them, although it may afterwards appear that they were at that time of no value. But if the notes be given subsequently to the contract (though but a few hours, as in the case last referred to) in payment of a "precedent debt," the risk of solvency is not on the person receiving, but on him who gave it in payment.

To sustain these positions we refer° to the following cases : *Bank of England* vs. *Newman*, 1 *Lord Raymond*, 422, and 12 *Modern*, 241; *Hartop* vs. *Hoare*, 3 *Atk.* 51; *Ward* vs. *Evans*, 2 *Lord Ray'd.* 930; *Fydell* vs. *Clark*, 1 *Esp. Ca.*, 447; *Emly* vs. *Lye*, 15 *East*, 12; *Hornblower* vs. *Proud*, 2 *Barn. & Alder.* 327; *Cammidge* vs. *Allenby*, 13 *Com. Law*, 20; *Stedman* vs. *Gooch*, 1 *Esp. Ca.* 3 ; *Puckford* vs. *Maxwell*, 6 *Term*, 52 ; *Byles on Bills*, 91 ; *Whitbeck* vs. *Vanness*, 11 *Johns.* 409.

In what we have said in relation to the rule that has been adopted, and the distinction that has been taken, we are to be understood as speaking of cases which are free from fraud, and where the notes are genuine and such as they purport to be ; for° if they prove to be counterfeit, or if there be misrepresentation, concealment, or fraud of any kind, a transfer of such notes, or genuine notes under such circumstances, will not in either case be held to be payment. *Jones* vs. *Ryde*, 5 *Taunt.* 488; 1 *Com. Law*, 166; *Markle* vs. *Hatfield*, 2 *Johns.* 459 ; *Willson* vs. *Foree*, 6 *Johns.* 110.

Our conviction that the distinction to which we have referred being at this time the settled law has not been shaken by the cases brought forward by the counsel for the defendants. The existence of the rule and its propriety are different questions. If we find it established we are bound to yield to it. In *Lightbody* vs. *The Ontario Bank*, 11 *Wend.* 11, which was the case of a note of a bank that had failed being given in payment of a " precedent debt," and was expressly decided by the court on that point, chief justice *Savage* seems to doubt rather than deny the distinction that has been taken, and to make the law as to cotemporaneous debts depend on the proof that may be made of what was the understanding or agreement of the parties at the time of the transaction; without, however, determining what is the rule of law where there is no evidence of any understanding. The authorities cited by the chief justice which we will proceed to notice, do not deny the distinction between cotemporaneous and precedent debts, but rest on principles altogether distinct from this question.

In *Owenson* vs. *Morse*, 7 *Term.* 60, and in *Roget* vs. *Merritt & Clapp*, 2 *Caines*, 117, the contract had not been completed; it remained executory ; there had not been a delivery either of the goods sold or of the note which was to be received in payment; and under these circumstances it was held, that as the consideration had failed by the insolvency of the maker of the note, before the goods had been delivered or the note tendered, the vendor was not bound to deliver the articles sold, nor to answer in damages for their non-delivery, upon a tender of the note being made. Both these cases depended on the point of delivery and the right to stop goods in transitu, where

there had occurred a failure of consideration before the contract had been carried into execution.

*Puckford* vs. *Maxwell*, 6 *Term*, 52, was a case of payment to an *antecedent* and not of a cotemporaneous debt; and so too, from the language used by Lord *Kenyon*, would seem to have been the case of *Stedman* vs. *Gooch*, *Esp.* 3. *Markle* vs. *Hatfield*, 2 *Johns.* 455, was the case of a counterfeit note. *Johnson* vs. *Weed*, 9 *Johns.* 310, turned on a fact which was controverted, viz: whether there was any agreement or understanding between the parties, at the time of the transfer as to the note being indorsed or taken without recourse. In *Whitbeck* vs. *Van Ness*, 11 *Johns.* 409, judge *Spencer* cites with approbation the decisions of chief justice *Holt* establishing the distinction referred to. He assented to the judgment given by the court in *Markle* vs. *Hatfield ;* but says the reasoning of the chief justice went further than he or his associates intended. It does not seem to have been necessary in the case of *Lightbody* vs. *The Ontario Bank*, to have decided whether there existed such a distinction; for that was the case of a note that had been given in payment of an *antecedent debt*, and as to such cases it had never been doubted that the risk of solvency rested on the person who transferred the note. In the same case, when taken to the Court of Errors, 13 *Wend.* 101, chancellor *Walworth* confines himself to *antecedent debts*, and rules as to these, that bank notes, or the notes of third persons, when given in payment, are taken at the risk of the party paying, unless there be an agreement to the contrary. Senator *Van Schaick*, who delivered an opinion in the same case, (page 111,) coincides with the view taken by the chancellor, and in the principles pronounced by him in relation to antecedent debts.

Chief Justice *Savage* says, (11 *Wend.* p. 11,) he " apprehends there has generally been some *circumstance* in each case by which the court and jury could ascertain what was the agreement between the parties as to who should run the risk of the solvency of the note transferred in payment of goods." Now if there be no such *circumstance*, what rule does the law apply to the case? For it is in such cases that the law is called upon to furnish a rule, and not where there is an agreement or a *circumstance* that will satisfy the court and jury that there was an agreement. Unquestionably, that the note given at the time in payment for goods sold is at the risk of the person receiving ; in the absence of proof of any agreement, or of circumstances showing an agreement, as to the matter of risk.

In the case of the *Ontario Bank*, we can perceive no circumstance from which any agreement as to who should bear the risk of solvency can be collected, except the mere fact that the bank paid out, on

a check drawn on it, the note of a bank that had stopped payment: now this is not such a circumstance as will establish an agreement one way or the other; or else on the same principle, in every case in which a note had been passed off, which proved not to be of specie value, a like agreement would be inferred, and the person passing it be held a guarantor of the note, because he passed it: nor did the court decide that case on such a ground, but on the principle that the note paid out by the bank did not discharge the debt which the bank antecedently owed to Lightbody.

Judge *Sutherland*, in delivering the opinion of the court in *Porter* vs. *Talcott*, 1 *Cowen*, 333, questions the propriety of the distinction, but not the fact of it having been taken. He says, " a distinction is sometimes taken as to notes of third persons, whether given at the time of making the contract or for a precedent debt; but I apprehend, in *neither* case is it payment, unless it is *agreed* to be so taken, and if agreed to be so taken, it is equally payment in either case."

Unquestionably the settled rule of law as to responsibility may, in either case, be prevented from applying to the transaction by an agreement of the parties. If one purchases an article and delivers in payment for it a note, which is received without objection and nothing said about it, can it be said that there has been any agreement respecting its solvency, either express or implied between the parties? Certainly not. There being then no agreement, the law has to furnish the rule by which the transaction is to be governed. It settles what is to be taken as the legal consequence, effect or implication arising from the naked facts. If, however, an agreement be established, the law will carry out the agreement, and not apply to the case a rule regulating cases where no agreement has been made.

In the absence of evidence of any agreement, or of circumstances from which an agreement can be ascertained as to who should bear the risk of solvency, repeated judicial decisions have settled it as a legal principle, inference or implication, that when the note of a corporation or of a third person is given for a precedent debt, the solvency of the maker rests on him who passes it; because such debt cannot be discharged except by actual payment; paper, in itself, not being payment unless it produces money or its equivalent: but that, when such note is given at the time of contract, sale or exchange, in good faith, either for goods, money, bills, notes or credit, the responsibility of the solvency of the note rests on the person who receives it. In the latter case, if there be no agreement established, nor any circumstance indicating an agreement or understanding, is not the fact of the note being accepted without objection, or agreement or indorsement, pregnant evidence of the understanding of the

parties, that the note was received in absolute payment and as so much money? Does not the law rightly conclude that he was satisfied and voluntarily assumed the risk of solvency, when he had the power, which he declines exercising, of preventing all question or doubt on the subject, by refusing the note, or requiring an indorsement or guaranty of it?

The distinction between precedent and cotemporaneous debts has prevailed in *England* ever since 1699, and has been recognized in the state of New York. by the courts of that state ; or why in stating the rule of law as to the cases in which notes do not operate as pay ment or so much money, have those courts confined it to " *notes given in payment of antecedent debts,*" if they considered that it was also applicable to notes given at the time of making the contract? By applying it to one class of debts, is it not a necessary inference, that they did not design to apply it to the other, but recognized a distinction between them. That the rule has been so restricted will appear from 5 *Johns.* 68 ; 11 *Johns.* 410, 520 ; 12 *Johns.* 411 ; 3 *Johns. Cases,* 72 ; 13 *Wendall,* 104.

No case like the one before us, so far as we can ascertain, has ever been brought before the courts of this state : the only one bearing any analogy to it is the case of *Jefferson and Jefferson* vs. *Holland,* decided by the late chancellor Ridgely, in Sussex county, at the March term 1820. In that case the complainants had sold to the defendant a tract of land, who gave his bond for the purchase money. In January 1818, Holland paid one-half the purchase money in bank notes, and promised to take them back if there should be any difficulty in passing them. On the 1st of July, 1818, about noon, Holland paid the complainants the second moiety of the purchase money in notes of the Bank of Somerset and Worcester, at Snow Hill, to the nominal amount of $720, in discharge of his bond. Jefferson observed at the time of this payment, that he supposed it was good money, and Holland answered that it was. The notes of the Snow Hill bank had been depreciated since the 10th of June, 1818, when the bank stopped specie payments, but they circulated at a discount at the place of this payment until the evening of the 1st of July, 1818. The complainants believed those notes to be good at the time they took them, but finding that the notes would not pass, they offered to return them to the defendant on the 6th of July, and on the 11th of July presented them at the bank, where payment in any way was refused. The chancellor decreed in favor of the complainants, saying : " the justice of this case is entirely with the plaintiff, and I cannot do better than to adopt the opinion of chief justice *Kent,* in the case of *Markle* vs. *Hatfield,* 2 *Johns. Rep.* 455. This, indeed, is ra-

ther stronger on the part of the complainants. It may be *doubted* whether the defendant *had not knowledge of the state of the Snow Hill notes at the time of the payment:* at any rate he *assured* the plaintiff *that they were good."*

That case varies essentially from the one before us, and cannot have any influence or weight in our present decision.

1. The notes in that case were given in discharge of an *antecedent debt*, and did not operate payment.

2. There were suspicions of fraud against the defendant; that he passed the notes, knowing their depreciated state.

3. That he passed them with an assurance to the complainants that they were good.

We have not heard or seen any thing in the course of the argument of this case, or in the authorities produced, which inclines us to unsettle a rule of law long established in that country from which our principles of jurisprudence have been drawn: and after considering the questions presented for discussion by the case stated, and examining the authorities cited as well as some others, and weighing the arguments of the counsel on both sides, who certainly discussed this case with great ability, our conclusion is—

That when a bank note is given bona fide and received without objection, in exchange for goods, money, notes or bills; or on general deposit by a bank, and there is no agreement or understanding, express or implied between the parties, as to which of them shall stand the risk of the *then* or *future* solvency of the bank issuing such note; the party thus receiving such note assumes all the risk of its solvency, and is without remedy against the person from whom he thus received it, although it may afterwards appear that the bank issuing such note, had at the time of the transaction failed.

It is not pretended in this case that there was any *express* agreement or understanding between the parties that the solvency of the bank notes deposited, was to be at the risk of the plaintiff: the only circumstance relied on to show that such agreement or understanding is to be *implied,* is the mere fact, that the defendants received those notes from the plaintiff as cash, and that on the morning of the day they were so received, the Bank of Maryland had closed its doors, being then insolvent: a circumstance equally unknown to both the parties at the time of the deposite. The law will not imply such agreement from the mere fact of insolvency.

Are there not, however, some circumstances, some intrinsic evidence, arising from the nature and course of the transaction between these parties, from which an agreement or understanding directly to the contrary might fairly and legitimately be implied?

The plaintiff in his letter to Mr. Spruance inclosing the notes, and which was laid before the cashier, shows an anxiety to get rid of these notes and to be free from responsibility concerning them. He had received them on that day; sends them forthwith to the bank, and urges an answer by the mail of the following day, that he may make some other arrangement, if the Bank of Smyrna should decline taking them on deposite. In his letter he intimates a doubt whether, under *ordinary circumstances*, the bank would receive Baltimore notes. Why this doubt, if the notes of the banks in Baltimore were above all doubt or suspicion? Do not the banks of this state at all times eagerly lay hold of the bank notes of the neighboring cities of Philadelphia and Baltimore, whose credit is not questioned?

In order to obviate this apprehended difficulty, he proposes to the bank, that if it will receive the notes transmitted and credit him with their amount, the sum thus credited may remain on deposite for one year, or until a certain suit between George Houston and the assignees of David Wilson is decided. Why this unusual feature in this deposite; why give the bank the use of the sum deposited for at least one year, to remain undrawn for a year; the plaintiff not to be at liberty to use his deposite for such a length of time, nor to receive any interest for it; why give the bank a premium of not less than six per cent. for taking these notes; why give the bank what was equivalent to more than $100; for by loaning or discounting on them (had they proved solvent,) for the period the credit was to remain untouched, a profit to this extent could have been realized? For all this was there to be no consideration on the part of the bank; was the plaintiff to be restricted from touching his deposite for a year, and also to be held as guaranteeing the solvency of the notes? In making his proposition not to draw the money for a year, he must have had some object in view, and the bank must have so understood him: we cannot suppose that the mere transmission of the notes to Baltimore, and the receiving cash for them could have been the object of the plaintiff, or the consideration expected from the bank for permitting the deposite to remain; for this could have been done by the plaintiff sending a messenger to Baltimore at an expense not exceeding probably $10; and yet the bank was offered what was equal to $100. Is it not, therefore, the reasonable and fair inference from these facts, that the design of the plaintiff in making his proposition was to be relieved from all responsibility in relation to these notes, and to effect this tendered the credit on the deposite; and that the defendants must have so understood him when they accepted his offer, and by accepting it became bound by that implied understanding or agreement.

In a case like that before us, the law implies that the bank took

the notes at its own risk, no agreement or understanding express or implied being established to the contrary. The facts in this case would also lead us to infer that such was the understanding of the parties: but at all events, these facts do not lead us to the belief or conclusion that there was between the parties at the time the transaction took place, any agreement or understanding express or implied, that there was to be any responsibility on the part of the plaintiff, for the then or future solvency of these notes. There is not a single fact or circumstance in the case stated, to bring the mind to such conclusion; and the case, therefore, is to be governed by the principle of law which has been established in relation to notes given at the time the contract is made.

There is another view of this case, on which it might be decided on principles well settled.

The solvency of bank notes or the notes of individuals may, by *agreement* be assumed either by the party paying or the party receiving them: admit, for the argument, that the solvency of the bank notes in question was distinctly assumed by the plaintiff. When the failure of the Bank of Maryland became known to the defendants, what was their incumbent duty; what does the law require to be done in like cases by the person receiving such notes, to enable him to resort to the person passing the note? Why, it requires the holder to give reasonable notice of the *insolvency* of the maker of the note, to the person from whom he received it, or that person will be discharged in law, from the responsibility he assumed. *Tindall vs. Brown,* 1 *Term,* 167; *Cammidge* vs. *Allenby,* 13 *Com. Law,* 203; 1 *Wash. C. C. Rep.* 156; *Byles on Bills,* 163.

It has been thought in some cases, that the notice should go further and apprize the party, that *the holder looks to him for payment of the note.* We doubt if this be essential, as it might be properly inferred from the notice. See *Bank of U. S.* vs. *Carneal,* 2 *Peters,* 553. *Knowledge* is not *notice. Legal notice* is required. To be *legal* it must be given by a party to the instrument or his agent, or by one through or to whose hands it has passed. *Stewart* vs. *Kennett,* 2 *Campb.* 177; *Byles on Bills,* 163; *Ex parte Barclay,* 7 *Vesey,* 597; *Chitty on Bills,* 225-6; *Tindall* vs. *Brown,* 1 *Term,* 167; 3 *Kent's Com.* 93, 104, 108, 110. There must be positive proof of the fact of notice, not probable evidence. The onus probandi lies on the party holding the note; he must show that notice was given and in due time. *Lawson* vs. *Sherwood,* 1 *Stark. Cases,* 251.

The plaintiff in this case may have acquired a *knowledge* of the failure of the Bank of Maryland as early as the officers of the Smyrna Bank, and in the same way; but such knowledge or any

other knowledge of this fact, unless communicated by the bank or its agents, is not enough. The law requires that notice of the fact of insolvency be given by the holder, in order that the person from whom the note was received, and who was the guarantor of its solvency, may be apprized that the holder *stands on his legal rights*, and looks to him for payment.

It does not appear from any thing in the case stated, that *notice* of the *insolvency* of the Bank of Maryland was ever given to the plaintiff by the defendants. The only notice stated to have been given was that contained in the letter of the cashier of the 27th of March, which merely apprized the plaintiff that the money passed to his credit on the 25th of March, " is *received as a special deposit*," and that the notes would be kept by themselves subject to his order. This is no notice of the " insolvency" or stoppage of the Bank of Maryland, but merely notice that the bank had arbitrarily done what the plaintiff knew they had no right to do, and might well disregard as not being an act that could affect his rights.

If the plaintiff assumed the responsibility of the solvency of these notes, the bank had the right in the event of the failure of the Bank of Maryland to call on him to make good their loss. This was their legal right and all their right, and was to be enforced according to the rules the law has prescribed ; one of which imperatively demands that *notice* of the *insolvency* be given or else the liability is discharged. It did not necessarily follow, because the bank had changed the deposite from a general to a special one, that it was done in consequence of the Bank of Maryland or the Bank of Messrs. Cohens having failed. No such reason nor intimation of such fact is given in the letter addressed by the cashier to the plaintiff; nay, the latter bank had not failed, nor has it since failed.

The plaintiff might have *inferred* from the notice, that the banks whose notes he had deposited, had stopped payment ; but it would have been only an inference, and a wrong one too as to one of those banks, that of Cohens. Direct and explicit notice of the failure or insolvency of the Bank of Maryland should have been given on the part of the defendants to the plaintiff to fix his liability for the insolvency of its notes which he had deposited, even if he had assumed their solvency, and this not having been given by the bank, it has been guilty of such laches as, according to the settled principles of law, discharges the plaintiff from responsibility for the solvency of the notes in question.

One question remains to be disposed of. It is contended by the defendants counsel, that there is no sufficient consideration to sup-

port the present action, as the Bank of Maryland had failed before the deposite was made, and its notes were then of no value.

Whether the receipt by the Smyrna Bank of these notes, in the manner they were received and credited, is a sufficient consideration to maintain this suit, depends upon the determination of the question, on which of the parties did the responsibility of the solvency of these notes rest. If it rested upon the plaintiff, then there is not a sufficient consideration for this action. But if it rested on the defendants, then there is a sufficient consideration. If in law these notes are to be considered as having been taken at the risk of the bank, or if they are to be held as taken at the risk of the plaintiff, and the defendants by their laches have discharged him from that responsibility, then there arose a legal obligation upon the bank to pay the plaintiff the amount of the deposite. A legal obligation to do a thing is a sufficient consideration for a promise to do it. 2 *Kent's Com.* 465. The law having established the obligation to pay, a promise to make the payment would necessarily be implied. The law never imposes an obligation or legal duty to do an act unless there exists a sufficient consideration for it. In our judgment the risk of the solvency of the notes of the Bank of Maryland rested, according to established legal principles, upon the defendants; and those principles imposed upon the defendants, as a consequence of the deposite accepted by them, an obligation or legal duty to pay the plaintiff the amount of the notes thus taken by them as cash; and give to the plaintiff a legal right to recover such amount. It necessarily follows, therefore, that there exists a sufficient consideration for such recovery; for otherwise the duty or obligation to make such payment would not have been created by law.

The deposite of a check to the credit of a person was held, in the case of *Bolton* vs. *Richard,* 6 *Term* 139, to be equivalent to the transfer of so much money in the hands of the person receiving the deposite to the credit of the person making the deposite. In the case of the *Bank of Kentucky* vs. *Wistar,* 2 *Peter's,* 318, a deposite in that bank of the notes of the bank which were at the time passing in the country at one-half of their nominal amount, entered generally to the credit of the person for whose benefit the deposite was made, and not as a special deposite, was considered by the Supreme Court of the United States as equivalent to depositing so much gold or silver. In the case before us, the deposite was not a special one, but general, as so much cash. We, therefore, adopt the language used by justice *Story,* in the suit by the *Bank of the United States* vs. *The Bank of Georgia,* reported in 10 *Wheaton,* 333: "Considering, then, the credit in this case as a payment of the notes,

the question arises whether after a payment the defendants would be permitted to recover the money back; if they would not, then they have no right to retain the money, and the plaintiffs are entitled to a recovery in the present suit."

With the views which we entertain of the law applicable to the case before us, the defendants could not, under the circumstances of it, have recovered back from the plaintiff the amount of the notes in question, even had they paid the same in coin to the plaintiff, instead of receiving them as they did from him on general deposite; and, therefore, the plaintiff is entitled to a recovery in the present suit of the amount with which he was credited on the books of the bank at the time the notes were deposited. In answer to the argument which was urged on this point by the defendants counsel, and to support the view we have taken of it, we would refer to the three cases last cited; and also to that of *Levy* vs. *The Bank of the United States*, reported in 1 *Binney*, 27, and in 4 *Dallas*, 234.

It is, therefore, the opinion of a majority of the court:

1. That there is no evidence, direct or circumstantial, disclosed to us in the case stated, to lead us to the conclusion, that there was between the parties to this cause at the time of the deposite made by the plaintiff in the Bank of Smyrna, of the bank notes in controversy, any agreement or understanding, express or implied, that the plaintiff was to be answerable to the defendants for the solvency of the notes deposited.

2. That the facts set forth in the case stated are such as to lead to the belief or inference that the defendants, when they received those notes, did so with the understanding that they received them as so much coin, and that they voluntarily took upon themselves the risk of the solvency of the notes.

3. That in the absence of evidence of any agreement or understanding express or implied, those bank notes, according to the well established principles of law, are to be considered as having been received by the Bank of Smyrna as money at its own risk, and that the plaintiff is not responsible either for the then or future solvency of those notes; they not having been deposited to discharge any pre-existing debt, but parted with on deposite and to obtain a credit in the bank to be futurely used by the plaintiff.

4. That even if they had been taken by the Bank of Smyrna at the express risk of the plaintiff as to their solvency, his liability was discharged by the laches of the bank in not giving him due and distinct notice of the insolvency or failure of the Bank of Maryland.

5. That the risk of the solvency of these notes being fixed upon the defendants by settled legal principles, a legal obligation attached to them, to pay to the plaintiff the amount credited to him on the

books of the bank at the time of the deposite, and that there is therefore a sufficient consideration to support the present action; and that judgment should be entered for the plaintiff for the whole amount deposited by him.

LAYTON, *Justice.*—I have been unable to take the same view of the law applicable to this case, that the other members of this court have taken, for the following reasons—

This is an action of assumpsit for money had and received: an action which has been well compared to a suit in equity. It is founded on the principle that what a man cannot in equity and good conscience retain, he shall be compelled to refund: and consequently, where the plaintiff has no claim in equity and conscience to the funds in the hands of the defendant, he shall not be permitted to recover.

As to the facts of this case, the parties are agreed. It is admitted, that they were equally innocent of any knowledge of the failure of the Bank of Maryland, at the time the notes were deposited with the defendant. The question is, which of these innocent parties shall sustain the loss which has occurred.

"Upon principles of justice and honesty," in the language of chief justice *Savage,* in the case of *Lightbody* vs. *The Ontario Bank,* " it would seem that whoever parts with that which is valuable should receive value for it; and he who receives value should give value in return." At the precise time these notes were deposited with the defendant, the bank which issued them had failed; and they had ceased in fact and in law, to be any part of the circulating medium of the country. The conventional regulations of the commercial world only sustained them, as they do all other bank notes, so long as they could sustain themselves. The moment the bank failed, its notes, which were but promises to pay, became valueless as a currency, from the inability of the bank to redeem its promises. For all practical purposes, as a circulating medium, they are now little better than so many spurious or forged bills. The time, therefore, of the failure of the bank, is the time which, upon principles of the soundest policy, fixes the character of its notes, and ascertains upon whom the loss consequent upon its failure shall fall. It is a period which can be readily ascertained, and which closes the door to a multitude of frauds. A distinction has been taken in the argument of this cause founded upon some adjudged cases, between a payment made on account of a pre-existing debt, and one made upon a present and cotemporaneous transaction. This, however, is a distinction without a difference. The principle has nothing to sustain it either in justice or sound policy; and, I apprehend, it is not to be relied on as the settled doctrine of the courts.

So far as I have been able to examine and understand the authorities cited in the argument of this cause, I think the most, if not the whole of them, may be reconciled on this point, upon the ground, that the agreement of the parties at the time of receiving the paper, or notes, whether on account of pre-existing debts, or for goods sold at the time, precluded them from looking beyond their contract. As if a party receiving promissory notes in payment of goods sold at the time, expressly agrees to accept them in satisfaction of those goods, he is bound by his agreement, although the notes may turn out to be valueless. It is admitted on all sides, that a payment of such notes, on account of a pre-existing debt, would not discharge that debt till the notes themselves had been paid. And yet it will not be denied, that if the creditor expressly undertook to accept those notes in satisfaction, and to run all risks, he could not afterwards escape from his agreement. In both classes of cases the agreement of the parties gives character to the transaction; and, in the absence of any express agreement, the law will not create an agreement by implication. (*a*.) In the absence of an express agreement on the subject, the transfer or payment of such notes could never operate as a bona fide consideration for value received; and it would be iniquitous for the party to retain a valuable commodity when he had given no value in exchange.

The case of *Owenson* vs. *Morse*, 7 *Term Rep.* 60, is full to this point. The principle there established is this: "If the seller of goods take notes or bills for them, without agreeing to run the risk of the notes being paid, and the notes turn out to be worth nothing, this will not be considered as payment." The whole court, who delivered their opinions seriatim, recognized and relied upon this sound and equitable principle. Lord *Holt*, in the case of *The Bank of England* vs. *Newman*, 1 *Lord Raymond Rep.* 442, (which has been, as to this point, mainly relied on by counsel for the plaintiff,) appears to have acted on this principle. He considered that transaction as a plain sale of the bill for a discount, and that the seller, from the nature of

(*a*.) Implied promises arise from this general intendment of law, "that every man hath engaged to perform what his duty or justice requires." 3 *Blk. Com.* 160, (*Archb. ed.*) Promises "will be implied under the following circumstsnces, 1st, where the consideration consists in the plaintiff's having been compelled to do that to which the defendant was legally compellable; and, 2dly, where the defendant has adcpted and enjoyed the benefit of the consideration." *Smith's selection of leading cases, Law Lib.* No. 55, *p.* 55, in note to *Lampleigh* vs. *Brathwait.* It would be difficult to apply these principles in favor of the plaintiff in this cause.

the case, did not become a new security. But this case of *The Bank of England* vs. *Newman* has, I think, been too much relied on, and does not warrant the inferences and principles which appear, by some subsequent decisions, and by the counsel in this cause, to have been deduced from it. As this is the leading case on this subject, it requires examination to ascertain its precise signification, and the true point which was determined by it. The report of that case states, that " Bellamy signed a bill payable to Newman or bearer. Newman came to the Bank of England and asked how much money they would give him for this bill. They took the bill, and gave him so much money, allowing so much for discount. After that the bank received £10,000 of Bellamy, and afterwards they send a man to demand the money due upon this bill of Bellamy; and a demand was made of Bellamy's servant, who did not pay the money. And afterwards Bellamy fails, and the bank sue Newman for the money which he had received of them for this bill, as for so much money lent by them." Upon the general issue pleaded, the verdict was for the plaintiff against Lord *Holt's* opinion. And a new trial was granted, " because this was a plain sale of the bill." " For, per *Holt* chief justice, if a man has a bill payable to him or bearer, and he delivers it over for money received, without indorsement of it, this is a plain sale of the bill; and he who sells it does not become a new security. But if he had indorsed it, he had become a new security, and then he had been liable upon the indorsement." But upon a new trial the jury found for the plaintiffs. Here was a plain sale by Newman to the Bank of England of a bill drawn by Bellamy, which bill *at the time of its sale was good*, on which £10,000 were received afterward, but which subsequently became valueless by the failure of Bellamy. The question was not before the court as to what would have been Newman's responsibility if he had negotiated this bill subsequent to Bellamy's failure, of which failure the bank was ignorant at the time. Upon a fair construction of that case, we may safely deduce this general principle, that at the time of the negotiation or sale of the bill, the vendor undertook to warrant the present value thereof, but was not to be considered as becoming in any way responsible for any subsequent failure of the drawer of the bill. This principle is sustained by other decisions of Lord *Holt*; as in the case of *Tassell & Lee* vs. *Lewis*, 1 *Lord Raymond's Rep.* 743-4, and of *Ward* vs. *Evans*, 2 *ib.* 928.

Such being the general principle of the case of *The Bank of England* vs. *Newman*, it would appear that any decision which has carried that case beyond its legitimate determination, is not to be relied on as an authority.

But the case of a deposite of money in a bank by one of its custo-mers cannot, in my judgment, without the most forced and violent construction, and the most strained legal fiction, be considered as a sale of the money so deposited by the depositor. The very term itself, a deposite, contradicts any such conclusion. In point of fact, it is a loan made to the bank, to be repaid at the pleasure of the creditor. And the depositor is the creditor, and the bank the debtor in that transaction. A deposite of forged bills or notes, unless under peculiar circumstances, as in the case of the *United States Bank* vs. *The Bank of Georgia,* would not be such a loan as could be recovered by the depositor. Nor would a deposite of base, adulterated coin, create a liability upon the bank to pay, in exchange, in a sound currency.

I am aware that many of the authorities speak of payments made upon pre-existing debts, and of payments made for goods sold at the time; whence one might infer, that they recognized an essential dis-tinction, in principle, between the two. But, as before remarked, I think the courts have considered in all the cases of payment for goods sold, that the parties agreed to receive the paper in payment at the time the goods were sold, or made it their own by the act of negotiating it.

In the case of *Johnson* vs. *Weed,* 9 *Johns. Rep.* 311, the court held, as the concurrent authority of the books, "that there must be a clear and special agreement, that the vendor shall take the paper absolutely as payment, or it will be no payment if it afterwards turns out to be of no value."

The only case that has been decided in this state, of which I have any knowledge, that bears upon the one now before the court, is that of *Jefferson & Jefferson* vs. *Holland,* at the March Term, 1820, of the Court of Chancery in Sussex. That case has already been adverted to by Judge Black, and need not again be recited. It is true that case was to recover money paid on account of a pre-existing debt; but, in my judgment, a debt created upon a cotemporaneous trans-action is as much a debt in equity and in law, and as binding on the conscience of the debtor, as though it were one of fifty years stand-ing. And I cannot appreciate the justice, or the policy of creating a distinc ion between them. The consideration passing at the time of the transaction, ought to be a good and valuable consideration, whether it be in reference to a present or a precedent debt.

The case of the *Bank of the United States* vs. *The Bank of Georgia,* 10 *Wheat Rep.* 333, is not an authority in point, and does not affect this case. That was a case of the receipt of forged paper by the bank against whom the forgery had been committed; and the de-

cision turned upon the point that the bank was bound to know its own paper; and also, that after the receipt of it, the Bank of Georgia had been guilty of a neglect of duty, and had not given due notice of the facts to the plaintiff.

Upon the general principles deducible from this case, and applicable to this form of action, I think the case of *Lightbody* vs. *The Ontario Bank*, 11 *Wendell*, 9, and 13 *Wendell*, 101, is in point. For, although that was a payment on account of a pre-existing debt, the reasons assigned, and the principles there decided, apply with great force to this case.

As to the allegation of a want of notice to the plaintiff, by the defendants in this action, of the failure of the Bank of Maryland, and the charge of the defendants being guilty of laches, I think a full answer to that part of the argument, (and which, by the way, was pressed with much force, and discussed with great ability,) is to be found in the fact, that *these matters form no part of the case stated.* The only question presented for the consideration of this court in the case stated, is this, " the plaintiff submits it to the court, that by the cashier's act of receiving the said notes as cash as aforesaid, and in consequence of the entry to that effect on the books of the bank, the said bank had made the notes their own, and must bear the loss." There is not only no want of notice alledged, but, in my opinion, the whole case, upon a fair view of it, is a clear waiver of notice. The very terms of the case stated show that the plaintiff had notice, and took notice of the facts of the case, by the receipt of the letter from the cashier, under date of March 27, 1834, and in the conversation which, it is agreed, took place between the plaintiff and the said cashier, immediately upon the receipt of that letter. The plaintiff evidently considered this paper his own, and *proposed to commence* a suit against the person from whom he had received it, " if the bank should deem that course best." The case states, " The plaintiff then informed the cashier that *he would go and see the man that had passed upon him this paper, and if he refused to take it back, he* (*Corbit*) *would willingly commence suit against him if the bank should deem that course best.*" If he did not consider the paper as belonging to him, and virtually in his possession, how could he, without the greatest absurdity, speak of commencing a suit against the individual from whom he had received it? There was no difficulty or contest at the time about this matter, but the plaintiff appeared to consider himself bound to become an actor in the business in whatever way the bank should deem best.

The plea of a want of notice, therefore, is not sustained by, nor is it to be found in the case stated. It is an idea introduced into the

cause, subsequently to the making out and submitting the case to the consideration of the court.  It is a point, however, which from the great ingenuity and ability with which it was pressed, was well calculated to produce embarrassment; and which, if true in point of fact, would have been, I think, sufficient to carry the judgment of this court for the plaintiff.  But on a more careful view of the case, I find it was only the argument of counsel, and not the facts as agreed upon by the parties themselves.  The idea then, of laches on the part of the defendant, falls to the ground.

Such being my conviction of the law, and the facts of this case, I give it as my opinion, in answer to the question submitted by the parties, that "the said Bank of Smyrna had *not* made the said notes their own by the cashier's act of receiving the said notes as cash as aforesaid, and in consequence of the entry to that effect on the books of the bank;" and that the Bank of Smyrna ought not to "bear the loss of them."  The parties, however, have agreed that, in any event judgment may be rendered against the defendant, in favor of the plaintiff, "for the amount of the said notes of the said bank of J. J. Cohen, jr. & Brothers, to wit: for the sum of one hundred and sixty dollars.  My opinion, therefore, is that the plaintiff should recover, and judgment be entered in his favor against the defendant for that sum and no more.