IN THE

## COURT FOR THE CORRECTION OF ERRORS

OF THE

## STATE OF NEW YORK,

During the year 1834.

---

### ONTARIO BANK *vs.* LIGHTBODY.

Payment in the *bills* of an *insolvent bank* is not a *satisfaction* of a debt, although at the *time* and *place* of payment, the bills are in *full credit*, and the parties to the transaction are wholly ignorant of such insolvency, if previous to such payment the bank *has in fact become insolvent.*

ERROR from the supreme court. Lightbody sued the Ontario Bank, to recover the difference between the nominal amount of a *bank bill* received by him from the bank, on his check, and the amount realized by him on the same. Lightbody, on the *thirtieth* day of May, 1828, presented his check for $2000 at the counter of the branch of the Ontario Bank, in *Utica*, having a *deposit* there to an amount exceeding that sum, and received in part payment a $500 bill of the *Franklin Bank*, of the city of New York. On the same day he transmitted the bill to N. York, from whence it was forthwith returned to him, with information that the Franklin Bank had stopped payment at about ten o'clock A. M. of the *twentyninth* of May, at which time an injunction from chancery was served, suspending the operations of the bank. He offered the bill to the Ontario Bank, who refused to receive it. In July, 1828, he deposited the bill with the *receiver* appointed to

ALBANY, take charge of the effects of the bank, from whom, in April,
Dec. 1834. 1829, he received a dividend of 25 per cent., and in June,

Ontario Bank 1830, another of 8 per cent., which was all he realized from

v.
Lightbody. the bill. At the time when Lightbody presented his check
and received the bill in question, the bills of the Franklin
Bank were current in *Utica*, and continued so until the arri-
val of the eastern mail, on the *thirty-first* day of May. The
bill was paid by the Ontario Bank in good faith without any
knowledge that the Franklin Bank had stopped payment,
and was received by Lightbody in the ordinary course of busi-
ness. The cause was tried by a jury, who found a *special
verdict*, upon which the supreme court rendered judgment for
the plaintiff for the balance of the amount of the bill, after de-
ducting the dividends. See the opinion delivered by the
*Chief Justice*, on rendering judgment for the plaintiff, 11
*Wendell*, 9.

*C. P. Kirkland*, for the plaintiffs in error, submitted the
following points :

I. As a general proposition, genuine bank bills, of the in-
corporated banks of this state, are *money*.

1. They are the circulating medium of the country, and
are practically substituted for its coin.

2. By the course of trade and business, they are univer-
sally regarded and treated as cash.

3. By the uniform course of legal decisions, they are ad-
judged to be cash, except for the purpose of a formal tender,
and then they answer every purpose of coin, unless specifi-
cally objected to.

II. Payment in bank bills, current at the time and place
of payment, and the whole transaction being in perfect good
faith, is to every purpose the payment of money ; the pay-
ment is absolute, and is a full discharge of the obligation of
the debtor to the creditor.

III. There is no analogy between this case and that of *for-
ged* or *counterfeit* paper or coin. The latter are literally noth-
ing, and can represent nothing. Nor is there any analogy
between this case and that of *promissory notes of individuals;*

the latter are in no sense *money*, and in this particular partake in no degree of the character of bank notes.

IV. The rule contended for by the plaintiffs in error, should be adopted, because,

1. It recognizes the established course of things and mode of business, and carries out legal decisions already made.

2. It is required by commercial convenience, and by policy, which dictates the unrestrained circulation of this, the currency of the country.

3. It is free from difficulty in its application; is calculated to prevent litigation, and opens no door to fraud, for *bona fides* must exist to render the payment valid.

4. It imposes no hardship on the payee, for he is not bound to accept bills, and may require a guaranty before taking them.

V. The contrary doctrine is liable to many and insuperable objections:

1. It is contrary to the ordinary course of trade and business, and to the spirit of legal decisions declaring bank bills money.

2. It would impede and obstruct the free circulation of bank bills, so essential in a commercial community, relying mainly on them for its circulating medium.

3. It would greatly promote litigation; for every transfer of a bill, after the stoppage of a bank, would subject the payer to a suit; and these transfers might, and as a general rule would be, very numerous, before the knowledge of the failure could become general throughout the land.

4. It is uncertain and impracticable of application. The stoppage might be final or temporary; if temporary, it might be for a day, a week, or a month. The bank might be solvent or insolvent; if insolvent, its assets might pay any sum between one and one hundred per cent. of its liabilities; and many other circumstances might exist to render the amount of the payee's loss, if any, totally uncertain, indefinite, and contingent.

VI. Both parties having acted in perfect good faith, and each being equally innocent, the general principle *portior est conditio possidentis*, applies to and governs this case.

In support of these points, the counsel cited and commented upon 1 *Burr.* 452, 13 *East,* 137, 1 *Sch & Lef.* 318, *Roper on Legacies,* 3, 3 *T. R.* 554, 6 *id.* 335, 1 *Hammond's Ohio R.* 178, 6 *Harr. & Johns. Maryland R.* 47, 10 *Wheaton,* 347 12 *Johns. R.* 220, *id.* 395, 1 *Johns. Ch. R.* 238, 4 *Cowen,* 420, 5 *id.* 187, 19 *Johns. R.* 144, 9 *id.* 120, 2 *id.* 455, 11 *id.* 414, 6 *Mass. R.* 182, 5 *Taunt.* 488, 1 *Marshall,* 157, 1 *Cowen,* 383, *Chitty on Bills,* 2, 3 *P. Wms.* 356, 2 *Vesey, jun.* 120, 3 *Atk.* 232, 6 *Cowen,* 468, 4 *id.* 553, 1 *id.* 46, 3 *Burr.* 1354, 1 *Mass. R.* 66, 17, *id.* 42.

*J. A. Spencer,* for defendant in error.

The following opinions were delivered :

By the CHANCELLOR. The question to be decided is, which of the parties shall sustain the loss in reference to the bill of the Franklin Bank, received by Lightbody, paid upon the presentment of his check. The law is well settled, that where the note of a third person is received in payment of an antecedent debt, the risk of his insolvency is upon the party from whom the note is received, unless there is an agreement or understanding between the parties, either express or implied, that the party who receives the note is to take it at his own risk. The same principle is applicable to the notes of an incorporated bank, except that as to the latter there is always an implied understanding between the parties that if the bill, at the time it is received, is in fact what the party recieving it supposes it to be, he is to run the risk of any future failure of the bank. This implied agreement between the parties arises from the fact that bills of this descripton, so long as the bank which issued them continues to redeem them in specie at its counter, are by common consent treated as money, and are constantly passed from hand to hand as such. The receiving them as money, however, is not a legal, but only a conventional regulation, adopted by the common consent of the community ; as no state is authorized to coin money, or to pass any law by which any thing but gold or silver coin shall be made a legal tender in the payment of debts. This principle

of considering bank bills as money, which the receiver is to
take at his own risk, cannot, therefore, be carried any further
than the conventional regulation extends—that is, to consid-
er and treat them as money so long as the bank by which
they are issued continues to redeem them in specie, and no
longer.   When, therefore, a bank stops payment, its bills
cease to be a conventional representative of the legal currency
of the country, whether the holder is aware of that fact or not;
from that moment the bills of such bank resume their natural
and legal character of promissory notes, or mere securities for
the payment of money ; and if they are afterwards passed off
to an individual who is equally ignorant of the failure of the
bank, there is no agreement on his part, either express or im-
plied, that he shall sustain the loss which has already occur-
red to the original holder of the bills.   Upon the principles
applicable to cases of mutual mistake, as those principles
are administered in courts of equity, it is now settled that,
if an individual passes to another a counterfeit bill, or an
adulterated coin, both parties supposing it genuine at the time
it was received, the one who passes it is bound to take it back
and give him to whom it was passed a genuine bill or an un-
adulterated coin in lieu thereof, or in other words, to make
good the loss. *Markle* v.*Hatfield,* 2 *Johns. R.* 455.   That
principle of natural justice is equally applicable to the case
under consideration.   The actual loss had been sustained by
the failure of the bank while the plaintiffs in error were the
holders and owners of the bill ; and it is a maxim of the law,
that the loss is to him who was the owner at the time such
loss happened, if both parties were ignorant of the loss at the
time af making their contract.   Here, the one party intended
to pay, and the other supposed he was receiving the bill of a
bank which was redeeming its bills at its counter.   Suppose
the inquiry had been made of the defendant, "Do you expect
to sustain the loss if the bank should fail before you shall
have parted with this bill ?"   The answer, according to the
implied understanding of the parties, arising from the nature
of the transaction, and considering the bills of specie-paying
banks as money, would certainly have been the affirmative.
But if he had been asked, "Do you understand that you are

to bear the loss, if it should hereafter be ascertained that the Franklin Bank has now actually failed and stopped payment?" he would unquestionably have answered, "No ; in that event, as the loss will have happened while you was the owner of the bill, natural equity requires that you should bear it ; and I shall expect you to take back the bill and give me one which is good."

The principle adopted by the supreme court in this case, is also the only one which can protect the honest and unsuspecting against the frauds of those who might be disposed to take advantage of the ignorance of others as to the failure of a banking institution. A person who has heard of the failure of a bank while he has some of its bills on hand, will naturally be attempted to get rid of them for the purpose of avoiding a loss he might otherwise sustain ; and if he was disposed to be a rogue, he would keep his knowledge of the failure to himself until he could pay out his bills to those who were ignorant of the fact, and in such case he would escape with impunity, if those to whom he passed them were required to prove that he was aware of the failure at the time they received the bills from him. And even if the first person to whom a bill was passed should be so fortunate as to obtain proof to establish the fraud, if he had honestly parted with the bill while he was yet ignorant of the fact, so that the one who had received it from him could not call for repayment, the original holder of the bill, who was guilty of the fraud, would still escape with impunity. On the whole, I am satisfied with the judgment of the supreme court in this case ; not only as perfectly legal and just, but also as that which is most consistant with the substantial interests of the community, and founded upon a correct principle of public policy.

By Mr. Senator VAN SCHAICK. A powerful effort was made by the counsel for the plaintiffs in error, and many authorities were cited to prove that *bank notes* have been treated and viewed as *money*, both in this country and in England ; and he argued that payment in good faith, in bills current at the time and place of the transaction, constituted a full dis-

charge of the obligation of a debtor to his creditor, even though, as in the present case, the bank, in the bills of which the payment was made, had failed previous to the making of the payment.

The authorities adduced by the counsel were misapplied; and I consider it a full answer to the argument, which was founded upon them, to say, that there is no adjudged case in the books to authorize the inference that *bank notes* have ever been considered as money, except under the universally implied understanding, that the banks which issued the paper were able to redeem or to substitute a full equivalent for their issues; and therefore it is not a sound inference from the cases to say that the paper of a bank shall be entitled to the same consideration as money, after the bank has failed, that it had before, in in consequence of the confidence in its stability. To test this position, it will be sufficient to selcet a few of the strongest cases. *Miller* v. *Race,* 1 *Burr.* 452, was the case of a bank note stolen from the mail, and which fell into the hands of the defendant, an inn-keeper, honestly in the course of his business. The court decided that the action would lie upon the general course of business, and the consequences to trade and commerce, which would be much incommoded by a contrary decision. Lord Mansfield, in that case, says that bank notes ought not to be compared to what they do not resemble—goods, securities or documents for debts; that they are treated as *money,* as *cash,* by the general consent of mankind. "They are as much *money* as guineas themselves are, or any other current coin." The importance attached to the influence of the decision in this case upon trade and commerce is evidently overrated. The equity of the case itself is on the side of the party who last gave, in the pursuit of an honest calling, a valuable consideration for the money. Circumstances might change this; but, generally speaking, traders and others cannot be upon their guard to learn whether the sums of money they receive, suitable to the extent of their business, are stolen or found. But the case itself, and the character given by Lord Mansfield to bank notes as money, assumes the fact of the unquestioned solvency of the maker of the note. This is all im-

ALBANY,
Dec. 1834.

Ontario Bank
v.
Lightbody.

portant; for there is a vastly wider difference between the note of an insolvent and that of a solvent bank, than there is between a good note and an equal amount in guineas. In the case of *The Bank of the United States* v. *The Bank of the State of Georgia,* 10 *Wheaton,* 333, notes issued by the Bank of Georgia had been altered so as to increase the amount of the promise to pay from $590 to $5900. Having been received in the bank of the United States, they were, in the ordinary course of their exchanges, remitted to the Bank of Georgia, which received them as *genuine,* but subsequently discovering the alterations, offered to return them. The tender to return the notes was not made until nineteen days after their receipt. The case came before the supreme court of the United States upon a writ of error from the circuit court of Georgia. The supreme court reversed the judgment of the court below upon two points: 1. Because the circuit court had refused to instruct the jury, that if they believed the evidence, the plaintiffs were entitled to recover the ballance due by their customer's book; 2. That the plaintiffs were entitled to interest from the commencement of the action. Mr. Justice Story, who delivered the opinion of the court, did not consider that this was a case of a special deposite, but the notes were paid as money upon general account, so that, according to the *course of business* and *the understanding between the parties,* the indentical notes were not to be restored, but an equal amount in cash was to be paid; that the notes passed into the general funds of the Bank of Georgia, and became its property. Upon this ground, the action as to form was maintained. But in going into the merits, great stress was laid by the court upon the fact that these were not the notes of *another bank,* or the security of a *third person,* but were received and adopted by the bank as its own genuine notes, in the most absolute and unconditional manner; and the whole general reasoning of the case, separate from the principles of other cases which are brought to sustain callateral points, goes upon the broad ground that a bank is bound to *know its own paper.* This position is laid down with so much emphasis, that it must be considered as the controlling reason for the judgment of the court. How the question of a special deposit would

have been treated by the court, if the paper had been the al-
tered notes of the United States Bank itself, or of any other
bank, cannot now be known; neither does the case reach
the question of the notes of a third bank, being at the time of
the exchange or deposit, an insolvent institution.

Ontario Bank
v.
Lightbody.

In 1 *Ld. Raym.* 738, it was held, an action did not lie
against the assignee of a bank bill, because he had it for a
valuable consideration; and it always is an inquiry whether
the bearer came fairly by it. None of the cases proceed
exclusively upon the mere similitude between bank money
and cash, and the answer is the same to all the cases which
hold bank paper equal to money, as it must be to that in which
Lord Mansfield declares that bank notes are as much money
as guineas are—that is, that the judges always allude to
genuine and *solvent* notes. There are some individual opin-
ions of judges, however, which appear to militate against this
position. In the case of *Young* v. *Adams, Mass. R.* 182, a
payee recovered against a payer the amount of a $5 counter-
feit bill, which had been given him with other money. It is
impossible to find in this case any thing to support the doc-
trine, that a payment made in the bills of an insolvent bank
is valid. Yet the judge says, argumentatively, in a supposed
case, " When the bills paid are true and genuine, the *responsi-
bility* of the bank is, we *believe*, at the risk of the receiver."
But it is admitted that this construction goes " farther in favor
of the currency of bank notes or bills, than the authorities war-
rant in regard to private notes or bills, or even bankers' notes
in England when accepted in payment." But the suggestion
is afterwards qualified in the following manner. " Private
notes, that is, of individuals or companies, whether incorpo-
rated or not, where the currency of them is not regulated by
some *notorious* and *peculiar* usage, when accepted in payment
or discharge of an existing contract, are taken at the risk of
the payer." And the converse of this proposition must be,
that such notes as are regulated by notorious and peculiar
usage are at the risk of the payee. But if this proposition
were the foundation of a case to be decided, it is not certain
that this would be a satisfactory view of the question, since
between the circulation and appreciation of public bank notes,

issued by different institutions, there is as great a difference as between public bank notes as such, and private notes, whether of private banks or individuals.    To say, because the community has become by habit inspired with confidence in the trustworthiness of banks and bank paper, that therefore a payment made in the paper of a broken bank, not knowing it to be broken, discharges the debt, is a principle not discoverable in any system of ethics or jurisprudence.  Policy may be deemed to require that bank circulation should be protected by a leaning in support of its reputation with the public ; but it is unnecessary.    If worthy, it will stand without the aid of legal decisions, which tend to prevert the right, and which some judges believe give a dangerous facility to bank circulation.  The convenience of a bank, and the honesty of its administration, are its safeguards.    When these are withdrawn, law can render to its circulation no effectual aid.

In ordinary use, and for many legal purposes, as in a bequest in a will or when bills are taken on execution, bank notes are deemed and taken to be money ; but after the payer has become insolvent, they can be so considered only for the purpose of indentification.    In real payments, they must possess money's worth.    Not having that intrinsically, it is to be sought for in the ability of the issuer to redeem his paper. The strict legal definite character given to bank paper by our laws is, that of *promises to pay* and *evidences of debt*, and this is at least consistent with the reality ; and when so considered, the case stands in a new light.    When a bank issues a note or bill, it creates a debt.    By law, this debt must be paid in specie, if it be demanded.    Into the engagment thus to pay, every bank necessarily enters, when it receives its charter.    By the terms of this agreement, neither party regards bank paper as money.    The circulation of its bills is derived from its credit ; and its credit is the concomitant of its acknowledged and permanent solvency.    Its bills circulate like coined metal, so long as their representative character remains unimpaired ; but a bank bill is not money, according to the understanding between the parties, any more than it is money according to the signification of that word.    It is admitted that bank notes, as the circulating medium of the

country, have acquired the denomination of money, from their convenience as a substitute for gold an silver, and their utili- ty in promoting the objects of trade, and in exchanging the products of industry; but after a bank has failed, its notes are deprived of those characteristics of money which entitled them to that appellation by the custom of trade, while they continued at a value equivalent with specie, or nearly so. Their convertibility into specie being lost, and their power of circulation having departed, not one of the ingredients of money remains, and they can be legally defined only as un- paid promissory notes.

But it may be well to show more particularly that our statutes do not yield to bank notes the character of money, even while they criculate. In the act concerning " monied corporations," 1 *R. S.* 589, § 1, they are called *notes* or other *evidences of debt*. In the *Session Laws of* 1830, *ch.* 243, § 1, *page* 265, the designation is still more explicit: "Notes, bills, or other evidence of debt, purporting to be a bank note." In the acts incorporating banks, their appellation is evidence of debt; and when mentioned in connection with bonds and promissory notes, they are not distinguished as money, but are regarded in the light of promises to pay. Besides, the inherent qualities and appropriate char- acteristics of all bank paper, are those which belong to promissory notes, " or documents for debts," and so I think we must consider them for the purpose of this adjudication. If bank notes be considered as mere promissory notes, then the rule to be applied to this case is, that " paper is no pay- ment of a precedent debt; it is always taken under the con- dition to be payment if the money be paid in convenient time." *Ward* v. *Evans*, 2 *Ld. Raym.* 928. This is the set- tled law, and the custom of trade in this country, " unless the party make it his own by agreement, or by the act of nego- tiating it." The cases of *Puckford* v. *Maxwell*, 6 *T. R.* 52 and *Owenson* v. *Morse*, 7 *id.* 60, were decided upon modifica- tions of this rule. The paper, possessing no value at the time the contract was made, and there being no agreement that the party was to take it at his own risk, was held to be a nul- lity, and the party might act as if no such bill had been giv-

en. In *Markle* v. *Hatfield*, 2 *Johns. R.* 455, the same principle prevailed; the party did not receive the compensation intended: it was a forged bank note. In *Johnson* v. *Weed*, 9 *Johns. R.* 311, the court says, " The books all agree that there must be a clear and special agreement that the vendor shall take the paper absolutely as payment, or it will be no payment, if it afterwards turns out to be of no value." The fact of an agreement is matter for the jury.

Owing to the extraordinary aptitude of the people of this country for business and trade—to the immense amount of our resources, which the application of industry and science are developing with constantly accumulating benefits to the community, and which require the indispensable aid of capital to bring them to market—and to the nearly total absence of specie in large districts of country—paper money has been rendered the common medium of the exchanges of property, or of barter, to a greater extent among us than in any other nation on the globe. Its great convenience and the hitherto indispensable necessity for its use have created the idea, that it should be clothed with the attributes of real money ; and this opinion neccessarily gains ground among the undiscerning ; but it ought not to be permitted to subvert the established principles of moral justice. When a citizen sells an article for cash, he is entitled to demand for it, not false, or spurious, or insolve, but good money, whether it be in coin or bills ; and when a man pays a debt, the medium of payment must turn out to be what he represented it to be at the time of payment. The preceding view of the subject demonstrates that the understanding that bank notes shall pass current as cash is entirely conventional, and cannot be traced to an original principle ; but the understanding that money shall be good at the time of payment is an original and always subsisting part of the agreement ; it goes to the root of every contract ; it relates to its essence and substance ; and, in strict morals, this consideration must take precedence of every other implication that may arise upon a bargain for money, or in the payment of a debt. In the case before the court, the bill was not at the time, what the receiver supposed it to be. The tacit agreement and understanding between the parties was,

what the universal understanding is in every traffic for mon- <span>ALBANY,<br>Dec. 1834.</span>
ey, that the paper is good at the time of passing ; and this is
a previously existing and more important understanding than Ontario Bank
that it circulates as money.                                   v.<br>Lightbody.

Mr. *Gallatin*, in his essay on the *Currency and Banking
of the United States, page* 29, says, " A payment made in
bank notes is a discharge of the debt, the creditor having
no recourse against the person from whom he has received
the notes, unless the bank had previously failed." This sa-
gacious statesman did not fail to perceive that the inherent
defects of paper money rendered it impossible to make
it fulfil at all times the offices of real money, and that in the
event of the failure of the bank, a question of equity might
arise between innocent parties to the transfer and acceptance
of these notes.   He does not merely reserve the point, but ex-
presses a decided opinion, without appearing to apprehend
that the currency of paper money will be retarded by the pro-
mulgation of an incontrovertible position.   The principle
adopted by Mr. Gallatin is founded upon common usage and
general consent, by which every person receives bank money
which has become current, under the implied understanding
that it is good and the bank solvent.   If a bank has failed
before the transfer of its notes from one person to another, the
primary condition of the contract has been touched in its vi-
tal part ; the understanding is not fulfilled ; the contract is a
nulity.   The want of knowledge at Utica of the failure of
the bank at New York cannot be permitted to remove the
consequences that ensued immediately upon the failure.   The
money must be lost in the hands of him who held it when
the bank failed.   On great moral and public considerations,
I can have no hesitation in deciding the case upon this prin-
ciple, and especially as it will have a tendency to prevent at
tempts which have frequently been made to commit frauds
by the circulation of insolvent bank paper.

There was no default in the party who received bad mon-
ey for good.   He transmitted the note immediately to New
York, and upon its return, offered it to the bank, but it was
refused.

ALBANY,    I am therefore of opinion that the judgment of the supreme
Dec. 1834.
court ought to be affirmed.

Rogers
v.         On the question being put, *Shall this judgment be revers-*
Kneeland,  *ed?* all the members of the court present, *twenty* in number,
with one exception voted in the negative. So the judgment
of the supreme court was *affirmed.*