## Wм. H. Mangum, Admr. etc., *v.* Dudley M. Ball.

1. Payment—Evidence—Province of Juries.—On the trial of an action of *assumpsit* on a promissory note, upon an issue of payment, proof that the defendant had offered, after the date of the alleged payment, to pay the whole amount of the note without referring to the alleged payment, is a fact proper to go to, and be judged of, by the jury, but is not conclusive against the plea of payment.

2. Confederate Money—Agency—Discretion—Liability of Agents.—Where during the years 1861-2, a principal placed in the hands of his agent, for collection, a number of notes and drafts, by their terms payable in United States currency, with no instructions as to the currency in which the collections were to be made, but leaving the agent to "exercise his discretion as to the procedure" to be taken "to enforce payment;" and, thereupon, the agent accepted Confederate currency in payment, and surrendered the notes and drafts to the debtors. *Held*: That the action of the agent was wrongful as to his principal—being without authority, actual or presumed—and that he is liable to pay to his principal the full amount of the notes and drafts in United States currency. And this, although Confederate money was, at the time and place of the payment, the only currency in circulation.

3. Attorney at Law—Responsibility of.—*Dictum:* That whenever an attorney at law disobeys the lawful instructions of his client, and loss thereby ensues, he is responsible for such loss. 5 Mass., 57.

4. Agency—Reciprocity of Liabilities—Set-off—Practice.—Against an agent for receiving depreciated funds contrary to, or without instructions, the proper remedy is *assumpsit* for money had and received. And, therefore, the claim of the principal in such case may be pleaded as a set-off or payment against *assumpsit* on a promissory note.

5. Principal and Agent—Presumptions Affecting their Relation to Each Other.—In the absence of any understanding between the principal and agent as to whether the latter is to be paid for his services, the law, by implication, supplies the neglect, holds him an agent for hire, and makes him accountable accordingly.

Error to the circuit court of Yazoo county. Campbell, J.

The plaintiff in error assigned the following errors:

1st. The verdict of the jury was contrary to the evidence and the law.

2d. The court erred in granting the instructions asked for the defendant.

3d. The verdict of the jury was excessive, and, for any balance against the plaintiff, is illegal and unjust.

4th. The set-off of defendant should not have been allowed, or if allowed, only for the value of Confederate notes.

5th. The allowance by the jury of Confederate money at its nominal amount, both by way of payment of the note sued on by plaintiff and for a balance after such alleged payment at its nominal amount, was erroneous, illegal and unjust.

The facts are fully stated in the opinion of the court.

*Hudson & Nye*, for the plaintiff in error,

Filed a brief and written argument, and cited the following authorities: 2 S. & M., 638; 7 S. & M., 24; 8 S. & M., 324; ib., 643; 12 S. & M., 604; 1 How. R., 19; 39 Miss., 17; 38 Miss., 348; 35 Miss., 506. They contend that if an agent has instructions from his principal he must pursue them, but if not, he is left to his discretion, and must be held to act according to the best of his own judgment. McLaulin v. Simpson, 3 S. & P., Ala. R.; 85; 2 Parsons on Contracts, 465–467. We hold that in this case, under all its features, that unless it appears that W. S. Ball was instructed by the defendant as to the kind of currency, defendant will be presumed to have intended the currency to be collected. Livermore on Agency, 28; 4 Tenn. R., 177; 4 Esp. R., 144; Cowp., 479; 1 Campb. N. P. Rep., 523; 7 East., 38; 1 T. R., 22; 1 Parsons on Contracts, 54–5–6; 11 Wend., 477; 3 P. Williams, 279; 4 Queen's B., 235; Story on Agency, § 265. Also, 2 Parsons on Contracts, 465–468.

Nothing is money but gold and silver or their legal representative. Confederate notes were neither. Craig v. State of Missouri, 4 Pet. R., 410. And if W. S. Ball collected in Confederate notes, the set-off cannot be maintained as for *money* had and received in this case. 7 How., 340. But if defendant ratified the act, he could at most only collect what Confederate notes were worth in money at the time of collection. 7 How., cited above; 40 Miss., 530; 4 Peters R., 410; 14 How. S. C. R., 38; 20 Curtis, 24; Overall v. Wright, 2 Caldwell Tenn. R. If the Confederate notes were collected to be a credit on the note sued on, and were not actually so credited, it is executory and cannot be enforced. Overall v. Wright, 2 Caldwell Tenn. R., 3; ib., 20; ib., 295; ib., 419; ib., 468, 472; 3 Head, 297–723; 6 Bing., 174; 10 ib., 110. That Confederate notes were *not money*, see Craig v. State of Missouri, 4 Peters R., 410; Orchard v. Hughes, 1 Wallace S. C. R.

To enable a defendant to maintain his action or set-off for money had and received in a case like this, he must show the collection of *money* in the legal sense. Nor can he recover in an action on the case unless he shows that the agent committed a *breach* of *orders*, or *gross neglect* or *fraud*. Livermore on Agency, 148–49; 1 Cowp. R., 479. The party was instructed to collect, and thus proved his authority, and no proof on his part, of exculpation, was necessary until there was proof inculpating him in a breach of orders, gross neglect or fraud, which orders must be shown by the defendant. 5 Days R., 556; 2 T. R., 188; 2 Kent's Com., 8th ed., 802. On the power and duties of agents, 1 Cushman R., 248; 2 Kent's Com., 7th ed., 809, 2d paragraph. That Confederate treasury notes were not *money*, see Williams v. the State, 12 S. & M., 58; 1 Nott & McCord, 9; 12 Wend. R., 547; 2 Leach, 1036; 2 Com. Law R., 269; see also, Susan J. McFarland v. James G. Randle (decided by this court and not yet reported).

*Miles & Epperson*, for defendants in error.

It is sought to set this verdict aside on the grounds that the

court misdirected the jury, and that the jury found against the law and evidence. The law as given at the request of the defendant, is so manifestly correct as to require no argument. More especially is this so when they are considered in connection with the instructions granted for the plaintiff.' Did the jury find contrary to the evidence? Supposing there was contradictory and conflicting evidence, it was the province of the jury to weigh it; and their decision fairly made will not be lightly disturbed. 3 Howard, 219; 4 ib., 338; 1 S. & M., 157; ib., 381, 400; 5 ib., 21. But there is no conflict. The whole testimony is reconcilable.

It is certain that the claims were passed in the hands of plaintiff's intestate with instructions to collect and pay himself. It is equally certain that he did collect more than enough to pay the claim sued on. Does the testimony of Mrs. Mangum and Mr. King stand in irreconcilable conflict with these facts? By no means. The defendant resides in Kentucky. The collection had been made in this state. Although the Confederate surrender of this department occurred in April 1865, and the army was paroled and disbanded in May, there were no mail facilities, and but little communication before December. When, therefore, the defendant offered to pay Mrs. Mangum the note sued on in December, 1865, it is fair to presume he did it in ignorance of the fact that the note had already been paid by collection of the claims therefor placed in the hands of plaintiff's intestate. That this is the true theory, we think there can be no doubt. It is certain that the jury must have adopted it in rendering their verdict.

It is said the verdict is wrong as being excessive. But this cannot be. The note sued on, and interest added up to date of trial, is less than $2,600. The set-off pleaded and proved, including principal and interest, exceeds $2,950, showing a balance due defendant of more than $350. The jury therefore, in finding $97 94 for the defendant, did not give him *as much as he was entitled to*. That this is so beyond cavil or doubt, no one will deny, unless the value of Confederate money can change it. But this is impossible. For leaving

out of view the vexed questions of governments *de jure*, and *de facto*, bill of credit, etc., it is only necessary to say that the plaintiff's intestate, having received these claims for collection with instructions to pay himself out of the proceeds, was at liberty to receive from the debtors whatever he chose; and the giving up of defendant's bills receivable, charges him or his estate with the amount. But if the court should think the verdict excessive, we are willing to remit the excess. 1 Howard, 19; 3 ib., 105; 7 ib., 675.

Tarbell, J. :

This suit was brought upon a note of which the following is a copy :

($1500.)                    " Memphis, Tenn., March 23, 1861.

One day after date I promise to pay to the order of W. S. Ball, fifteen hundred dollars, value received, at one per cent. per month interest.

( Signed)                              D. M. Ball."

Defendant pleaded usury and payment, and gave notice of set-off, consisting of notes, drafts, etc., of defendant, left with plaintiff's intestate for collection, amounting in the aggregate to $2,100 67, submitting with the notice, a " bill of particulars," setting forth a full description of each claim, against whom, amount, date of collection, etc. Plaintiff, by replication, remitted the excess of interest, and joined issue on the plea of payment. The cause was tried at the May term of the Yazoo circuit court 1868.

Plaintiff having read to the jury the note sued on, rested his case, when defendant proved, that through his agent, W. A. Edmunds, brother-in-law to W. S. Ball, and D. M. Ball, as well as to plaintiff, he placed in the hands of plaintiff's intestate, in 1861–2, a large amount of claims for collection ; that W. S. Ball, the intestate, was to " exercise his discretion as to procedure to be taken in enforcing collection," that the proceeds of collections were to be first applied to the payment of a debt due from defendant to W. S. Ball, the surplus, if any, to be held subject to the order of defendant;

By the debtors themselves, defendant proved the payment, in 1863, of these claims by them in Confederate currency to plaintiff's intestate to amount of $2,100 67, and the surrrender to the makers of the notes and drafts therefor.  The plaintiff then proved by Mrs. Mangum, wife of plaintiff, formerly wife of plaintiff's intestate, that in December, 1865, or January, 1866, defendant offered to pay her the note sued on in " greenbacks," saying it was the only debt he owed, and not claiming set-off, nor in any way alluding to the said claims and collections.  This offer to pay was confirmed by a brother of Mrs. Mangum.

It appeared that no instructions were given, nor was anything said as to currency in which the claims were to be collected; that defendant lived in Kentucky, and plaintiff's intestate lived a part of the time in Tennessee, part of the time in Mississippi, and a while in Alabama; that intercourse between the brothers was interrupted by the war, and that during that time, there was no other than Confederate currency in general use within the Confederate States.  The court instructed the jury at the request of the respective parties, as follows, to-wit:

For the plaintiff—

1st. Unless the jury believe from the evidence that the note sued on was paid, they must find for the plaintiff, the amount of said note.

2d. The burden of proof is on the defendant to satisfy the jury by the evidence that the note sued on is paid, and unless the jury are so satisfied, they must find for the plaintiff the amount sued for.

3d. If defendant placed in the hands of W. S. Ball sundry claims for collection, as his agent, and gave no instructions as to the kind of currency in which to collect, and knew at the time that Confederate money was the general or only money then paying debts in the vicinity of the debtors, and said Ball collected the claims in said currency in good faith, and that he was instructed to hold the money when collected subject to the order of said defendant, and did so hold the

money, and it was lost or perished without any fault or neglect of his, then the jury will find for plaintiff.

4th. If defendant requested W. S. Ball to collect the claims mentioned, as his agent, and contemplated the collection in Confederate currency, and they were so collected for him, then W. S. Ball was not liable therefor, if he used the money beyond its real value, in good currency, unless he accepted it at its nominal value in payment of the debt sued on.

For defendant—

1st. If the jury believe from the evidence that the defendants placed in the hands of W. S. Ball, in his life-time, sundry claims for collection, and he did collect them and failed to pay the amount thus collected over to defendant, his estate is properly chargeable with the amount, and it must be allowed as a set-off to the note sued on.

2d. The plaintiff is entitled to no abatement for the value of Confederate money ; provided, the jury believe his intestate received it at par in payment of notes and drafts collected by him without instructions from defendant to do so.

Thereupon the jury found a verdict for defendant for $97 94.    The plaintiff moved for a new trial, which being overruled, he excepted, and brought this writ of error.

The following causes are assigned for error :

1st. The verdict of the jury was contrary to the evidence and the law.

2d. The court erred in granting the instructions asked for defendant.

3d The verdict of the jury was excessive, and for any balance against plaintiff is illegal and unjust.

4th. The set-off of defendant should not have been allowed, or if allowed, only for the value of Confederate notes.

5th. The allowance by the jury of Confederate money at its nominal amount, both by way of payment of the note sued on by plaintiff, and for a balance after such alleged payment at its nominal amount, was erroneous, illegal and unjust.

Lengthy, earnest, and ably written arguments, which we have carefully examined, have been submitted on both sides,

wherein the various questions involved are forcibly discussed. From these arguments, from the evidence contained in the bill of exceptions, and from the instructions of the court to the jury, we are led to believe there was no relevant point untouched before the court and jury.

The case presents interesting questions, which have enlisted the liveliest attention of counsel. To the parties, the case is of course important, from the amount involved.

In our view, the solution of this case is found in the terms of the note sued on, and of the claims collected, and in the entire absence of instructions to the agent. 7 Wal., 447; 7 Hill, 128; 5 ib., 399; 51 Barb., 90; 36 ib., 349. We might, therefore, dispose of this cause in a few lines, but our duty would hardly be performed without at least a brief elucidation of our views of the questions presented.

Was the verdict contrary to the evidence? We think not.

The witnesses were few in number, and their testimony brief. As they were unimpeached; we presume they were unimpeachable. Their testimony was brief, uncontradicted, and, we presume, unquestionably truthful.

Mr. Edmunds, the brother-in-law of both the parties to this suit, and to the intestate, states: " My present recollection, and distinct impression is, that it was mutually agreed or understood between the two Balls, as fast as any collections could be made on said claims, such collections were to be applied to the payment of a certain indebtedness of D. M. Ball to W. S. Ball, for money loaned by W. S. Ball to D. M. Ball, * * * * any residue of collections in hands of W. S. Ball after the payment of D. M. Ball's indebtedness to W. S. Ball were subject to D. M. Ball's order or direction. Nothing was said or agreed as to kind of currency to be taken in payment of said claims. I think W. S. Ball was to exercise his discretion as to procedure to be taken in enforcing collection of said claims."

Mrs. Mangum, wife of plaintiff, and formerly of plaintiff's intestate, testified that in an interview with her in December, 1865, or January, 1866, defendant said "nothing to her about

these claims; did not mention them to her; neither did he speak of W. S. Ball having collected any money for him.'; She further said: " I know W. S. Ball would not have received Confederate money in payment of the defendant's note now in suit; said note was given by defendant to W. S. Ball for borrowed money; the money that defendant received was in United States currency, and at that time considered equivalent to gold."

By the debtors themselves, defendant proved the collection of, by plaintiff's intestate, of $2,100 67, and the surrender to them of the evidences of their indebtedness to defendant in 1863. Payments made in Confederate notes. As to the testimony that defendant offered to pay the note sued on to Mrs. Mangum in " greenbacks," this offer being declined, bound no one. It might have been made in ignorance of facts, or of his legal rights, or from some unexplained motive justifiable in itself. Not being accepted, his rights were unimpaired, subject to the opinion of the jury as to the effect of the offer in view of the evidence before them. The judgment of the jury is indicated by their verdict.

It is uncontradicted, that out of the first collections, the note sued on was to be paid. The jury gave effect to that understanding. It is equally uncontradicted that the surplus of collections, after paying the note sued on, was to be held by plaintiff's intestate, subject to the order of defendant. At the trial, the note and interest sued on amounted to about $2,600, while the claims collected, with interest, amounted to about $3,000—showing a balance due defendant of about $400 in round numbers. The verdict being for $97 94, *only*, it is evident the jury took into favorable consideration some of the facts or arguments suggested.

We are unable to discover any conflict of evidence even; and clearly that the verdict was not against the preponderance of the testimony, but that it was in strict conformity to undisputed facts on both sides.

On the facts, therefore, we see no occasion to interfere with the verdict of the jury, unless because the defendant was

entitled to a larger judgment. This case is one, however, wherein the judgment of the jury ought not to be lightly disturbed. Losses growing out of the war, as in this case, involves equities within the peculiar province of the jury to adjust. That they have done it, in this instance, in strict conformity to the facts proved, and with a due regard for the plaintiff's rights, it is due them to say.

Was the verdict against the law of the case? That defendant, in 1861 or 1862, placed in the hands of plaintiff's intestate, for collection, a large amount of notes and drafts, by their terms payable in United States currency; that in May, 1863, he collected these demands to the amount of $2,100 67, in Confederate currency, surrendering the notes and drafts to the makers and drawers thereof; and that he had no instructions as to currency, we suppose to be undeniable facts. The witness, Edmunds, states that, "W. S. Ball was to exercise his discretion as to procedure to be taken in enforcing collection of said claims." The jury evidently considered this "discretion as to procedure" to apply to the *mode and manner* of "enforcing collection," rather than to the currency to be received in payment; in which they were evidently right. For the purposes of these collections, W. S. Ball was constituted a limited, special agent, for the performance of this particular duty. His power, authority, and discretion were prescribed by the·papers placed in his hands. These papers called for United States currency. Unauthorized by his principal, he had no right to surrender these claims, except on payment according to their terms. In accepting property, or Confederate currency as money, in discharge of these debts, he voluntarily assumed to respond to his principal for the full amount. As to any *presumption* of authority, or instructions, to receive Confederate currency, arising out of the condition of the country, as it is in accordance with both law and fact, the verdict of the jury may be accepted as final, this point being embraced for their consideration, in the instructions of the court.

If the plaintiff's intestate was an attorney at law, which

does not affirmatively appear by the record, the decisions are numerous and uniform in this state, that if he received these claims for collection, under a general retainer only, he had no right to receive in payment other than lawful currency. Whenever an attorney disobeys the lawful instructions of his client, and a loss ensues, the attorney is responsible for the damages occasioned by the loss. 5 Mass. R., 57. Keller v. Scott, 2 S. & M., 81 ; ib., 514 ; 17 ib., 24 ; 10 ib., 36 ; 9 ib., 249 ; 11 John., 464.

A sheriff, who in some degree, stands in the relation of agent to the party for whom he collects money, has no right to receive depreciated paper money on execution in his hands.

Held to be not a satisfaction nor payment. 5 Howard, 246 ; 2 S. & M., 514.

If, as we suppose, plaintiff's intestate was a special agent for the collection of these claims only, the law is equally well settled. If he chose to accept property, or Confederate currency to the amount of his note against defendant, it was altogether for his own consideration, and not a matter of any concern to defendant. Beyond that, it was his duty to conform to his instructions, or his orders. Any material deviation from those instructions rendered the agent liable. Story on Con., sec. 369, and cases ; 24 Vt., 85 ; 8 Cow., 198. Paley on Agency ; Story on Agency ; Parsons' Con.; Addisons' Con.

He was not a general agent—nor a general collecting agent, such as is known in the larger commercial states and cities, with general powers, authority, and discretion, but a special agent, limited by the terms of the notes and drafts he was employed to collect. Ward v. Smith, 7 Wallace, 447, and cases ; 13 Wend., 105 ; 7 Hill, 128 ; 5 ib., 396 ; Story on Promissory Notes, sec. 115, and cases.

This author (sec. 115), says of the payee of a note : "He is also entitled to have it paid in the very money or currency in which it is made payable, and its value at the time of payment; and he is not bound to accept payment in any other manner. Thus, for example, he is entitled ordinarily to demand payment in gold and silver at its current value, or

the standard value in the country where it is paid or payable; and he is not bound to receive it in bank notes or in any other paper currency." Of course he would now be bound to accept legal tender notes under the law of Congress. " If the holder be a mere agent, he has no right to accept payment in gold, in lieu of money unless specially authorized so to do." Story on Promissory Notes, p. 389–400, and cases.

In Ward v. Smith, 7 Wallace, 447, the court held, " that the power of a collecting agent by the general law is limited to receiving for the debt of his principal that which the law declares to be a legal tender," etc. In 18 John. R., 366, citing 1 Com. on Con., 240, the court say : " An agent constituted for a particular purpose, and under a limited and circumscribed authority, cannot bind the principal by any act in which he exceeds his authority." *Vide* also, 51 Barb., 90; 40 ib., 648; 31 ib., 196; 8 Ohio State R., 1; 8 Wend., 494; 2 Nott & McCord, 489; 3 East., 251; 11 Johns, 464; 18 ib., 363; 7 ib., 132; 21 Wend., 610; 4 Vt., 47; Brayton Vt., 24; 19 Pickering, 55; 2 Hill, 190; 8 Wend., 494. The release of these claims by the agent on their payment in Confederate currency, accepted by him as money, renders him amenable to his principal in an action for money had and received, and these claims are, therefore, the subject of set-off. 51 Barb., 90; 11 Johns., 464; 4 Vt., 47; Brayton, 24; Chit. Pl., p. 351, and cases; 7 Johns., 132 ; 19 Pick., 55; Story on Agency, etc.

Counsel strenuously insist that defendant must resort to a special action for violation of instructions, negligence or fraud. It is true, most of the cases put by the writers on agency and contracts, from the facts of each, require a special action, but in this instance *assumpsit* for money had and received is the proper remedy. This form of action is as well defined, if not as old, as the common law itself. Beginning with the celebrated note of Mr. Day, to the case of Marriott v. Hampton, 2 Esp. R., 546, wherein he gives a collection of cases on the subject of money had and received, the line of demarkation has been clear and well defined to

the present time. *Vide* 8 Cowen, 198; 2 Burr., 1005; 1 Doug., 138; 5 Burr., 2589; 3 Bibb., 378; 11 Mass., 494; 4 Pick., 60–71; 11 Johns., 464; 6 Cow., 183; 5 Cow., 473; 16 Hall's Superior Court R., 453; 5 Wend., 207; 16 Mass., 483; 12 ib., 78; 5 Pick., 384; 7 ib., 214; ib., 220; 4 ib., 59; 6 Mass., 182; 1 Johns Ca., 205; 11 Johns R., 464; 12 Johns 276; 4 Day, 175; 17 Mass., 575; ib., 400, etc. Where an attorney or agent has discharged a debt due to his principal, etc., an action for money had and received will lie. 11 Johns R., 464. And property received as money will support this action the same as if money itself had been received. 7 Cow., 662. If one dispose of a note belonging to another, he is liable to the owner in an action for money had and received. 4 Vt., 47. If an agent entrusted with property to sell for money dispose of it, he is liable in this form of action, whether the sale be for money or not. Brayton, 24. The same doctrine is found in Ch. Pl.; Story on Agency, etc. There is no evidence in this case to show, or that tends to show, that defendant has *ratified* the acts of plaintiff's intestate as his agent in the collection of these claims, but the reverse.

It is in proof that these brothers met but once during the war; that in the interview between defendant and Mrs. Mangum, at the house of her brother, in December, 1865, or January, 1866, the subject of these collections was not referred to, directly or remotely. The only fact relied on by plaintiff in error to show ratification, is the presentation of these claims as a set-off in this suit. So far from sustaining the point made, it seems to us a repudiation of the acts of the agent, and a demand upon him, or his estate, to account for those claims or the proceeds in lawful currency. Story on Agency, sec. 255, and cases cited; 40 Barb. N. Y. R., 648–654; 2 Mass. R., 106; 8 Wend., 494; 17 Vt., 470.

A statement made by Mrs. Mangum, in her testimony, to the effect that she knew W. S. Ball would not have accepted Confederate currency in payment of the note sued on, for the reason that it was payable in gold or its equivalent, is one

which should not be overlooked. It shows that the attention of plaintiff's intestate was directed to this subject of currency. If he would not accept Confederate currency in payment of his own note, why should he ask his principal, for whom he was collecting, to accept it? There is an old and familiar sentiment of the books, not inappropriate, that a man should at least observe as much care of another's property, of which he is only the voluntary and unpaid bailee, even, as of his own. There is also another of a still higher dignity, that the engagement of a mandatary partakes of a trust in the execution of which a strict fidelity is required. And again, the doctrine of the books as to deposits or bailments, also without recompense, is this : " If a direction accompanies the deposit, it must be complied with strictly, and any deviation from the instructions will render the bailee liable."

The learned Story says : " The primary obligation of an agent, whose authority is limited by instructions, is to adhere faithfully to those instructions ; for if he unnecessarily exceed his commission, or risk his principal's effects, without authority, he renders himself responsible to the principal for the consequence of his act. If loss ensues, it furnishes no defense to him that he intended the benefit of his principal. The rule that agents are responsible for damages arising from breach of orders, negligence, or incompetence, admits of few or no exceptions in regard to agents who receive hire or reward for their service. Yet, independently of this consideration, the confidence induced by undertaking any service for another, is a sufficient legal consideration to create a duty in the actual performance of it. Therefore, a gratuitous or voluntary agent, though the degree of his responsibility is greatly inferior to that of a hired agent, is yet bound to exert such a portion of activity and care as may reasonably satisfy the trust reposed in him. If, therefore, a man do not choose to act upon the confidence appearing in the course of the transaction, to be reposed in him, he should reject it as soon as proposed.

This statement of Mrs. M., also shows that the attention of plaintiff's intestate being directed to the subject of the currency, while he would exact gold or its equivalent in payment of his own debts, he was willing to accept a depreciated currency, depending upon the chances of war in payment of claims held by him in a fiduciary capacity, as the agent of the one of whom he proposed to exact gold.

This evidence, no doubt, justly had its influence with the jury, so far as it detracts from those equities claimed for plaintiff's intestate, and which jurors will always entertain in adjusting cases of this kind. It is no answer to say that his orders were absolutely to collect, and that he was without instructions as to currency. The fact, nevertheless, stands out undeniably, that his mind was directed to this matter, and that on his own debts, he would not accept the depreciated currency of the Confederacy.

As to the suggestion of counsel that the plaintiff's intestate was perhaps an agent without recompense, the point was not raised in the court below, and if it had been, there is nothing in it. In the absence of any understanding between the parties, the law supplies their neglect by implication, and plaintiff's intestate is an agent for hire, so far as the issues of this suit are concerned. 25 Com. Law Reports, 208; 2 Blackstone's Com., 443; 1 Parsons on Con., —; Addison on Con., sec. 3, p. 48; 15 Con., 52; 28 Vt., 401; 4 Conn. 524; Ch. on Conn., secs. 11, 12–14.

Taken altogether, we think the instructions presented this whole case to the jury, who evidently had all the questions, not only fairly before them, but under consideration. By their verdict, they have rendered as even and impartial justice as is possible in cases of this character.